# IN THE SUPREME COURT OF IOWA

No. 12–1899

Filed July 18, 2014

Amended December 3, 2014

**STATE OF IOWA,**

Appellee,

vs.

**PATRICK EDOUARD,**

Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Marion County, Paul R. Huscher, Judge.

The State seeks further review of a decision by the court of appeals reversing a pastor's convictions for sexual exploitation by a counselor or therapist under Iowa Code section 709.15 and remanding for a new trial. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

Gary D. Dickey Jr. and Angela L. Campbell of Dickey & Campbell Law Firm P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Sheryl A. Soich, Scott K. Brown, and Laura M. Roan, Assistant Attorneys General, and Edward W. Bull, County Attorney, for appellee.

**MANSFIELD, Justice.**

A pastor who had sexual relations with four women in his congregation was convicted of four counts of sexual exploitation by a counselor or therapist and one count of a pattern or practice to engage in sexual exploitation by a counselor or therapist. *See* Iowa Code § 709.15(2)(*a*), (*c*) (2013).[1] The pastor appealed, contending: (1) the district court failed to properly instruct the jury on the sexual exploitation statute; (2) the district court abused its discretion in excluding expert testimony concerning differences between pastoral care and pastoral counseling; (3) the evidence was insufficient to support the pastor's convictions; (4) the district court erred in denying the pastor's discovery request for one of the victim's counseling records; (5) the sexual exploitation statute is unconstitutional as applied to the pastor; (6) the district court wrongly excluded certain fact evidence; and (7) the district court erred in the amount of restitution awarded against the pastor.

On appeal, the court of appeals reversed and remanded for a new trial. It found that the jury instructions were improper and the district court had abused its discretion in excluding the proffered expert testimony. Upon further review, we respectfully disagree with the court of appeals and find no error on these points. We therefore vacate the court of appeals decision.

We also reject the pastor's remaining claims of error, with two exceptions. We find the district court should have conducted an in

---

[1]For the sake of convenience, we cite to the current version of Iowa Code section 709.15 (2013). The general assembly made nonsubstantive changes to the relevant provisions of section 709.15 in 2013, which do not affect our analysis here. *See* 2013 Iowa Acts ch. 90, § 230. Prior to those 2013 changes, the legislature had last amended section 709.15 in 2004. *See* Iowa Code § 709.15.

camera review of the counseling records. We therefore remand so this review may occur, along with further proceedings if necessary. We also reverse the restitution award and remand for further proceedings thereon. In all other respects, we affirm the pastor's convictions and sentence.

## I. Background Facts and Proceedings.

We recite the facts in the manner most favorable to the jury verdicts.[2]

Patrick Edouard served as the pastor of the Covenant Reformed Church in Pella from 2003 to 2010. Witnesses testified that his sermons were "amazing," "great," and "dynamic." He was a "very talented speaker." "He definitely could preach the word of God."

V.B. and her husband were members of the church from the time Edouard arrived in 2003. In 2005, Edouard began making unsolicited calls to V.B. on her cellphone. V.B. was undergoing fertility treatments unsuccessfully and was struggling with her infertility. Edouard began asking questions about V.B.'s personal life, and she began to confide in him.

V.B. and her husband decided to look at international adoption. A potential opportunity arose to adopt four siblings from abroad as a group. V.B. was personally struggling with this adoption, and at the recommendation of her husband and her mother she decided to see Edouard. As V.B. related,

> I think it was in January or February of 2006, and we were getting ready to adopt the sibling group . . . , and I called

---

[2]Three of the victims testified that the first time they had sexual relations with Edouard he forced them to do so. Because Edouard was acquitted of the sexual abuse charges, we will not include further discussion of that testimony herein.

him from my office and told him that I wanted to come see him.

And he said, 'Great. I've been encouraging you to do that, to come see me. You know I've told you you can talk to me anytime.' And so he said, 'Just come tonight. We can just meet here at my study.'

When V.B. arrived at Edouard's house, Edouard's wife and family were present. Edouard told his wife, "We could be a while," and he and V.B. headed down to the study in the basement. Edouard then locked the door to the study so, as he explained, the children would not interrupt them. The study served as Edouard's office, and had bookshelves, a desk, and two couches.

Edouard asked V.B. how she was doing, and she explained she was really struggling with this adoption. "I wasn't sure if it was what God wanted for me in my life," she said. Edouard asked V.B. about her marriage and whether her husband was "meeting [her] needs." V.B. started to cry and said that things were difficult. At that point, Edouard made advances toward her and had sexual relations with her.

Edouard continued to call V.B. on her cellphone thereafter. He repeatedly told V.B. that her husband was not meeting her needs. He also told V.B. he was attracted to her. They would talk two or three hours a day. V.B. would call Edouard, in addition to Edouard calling V.B. This lasted for months. Edouard also arranged liaisons with V.B. during the workday at hotel rooms and other buildings near V.B.'s office. Edouard would appear at V.B.'s workplace uninvited.

Edouard insisted to V.B. that she did not really want to adopt, that she was doing it to please her husband. He told V.B. that her real struggles resulted from her unhappiness in her marriage—"the sexual frustration." V.B. testified, "His role was to protect me, because I had all

of this sexual energy that needed to be released, and he had to be there to protect me."

Edouard asked V.B. for money. As V.B. explained,

> he would make references to . . . it's possible that . . . God brought us together so that . . . I can provide for him out of the excess of my abundance, what I had, I could in turn bless him with that.

Edouard made it clear he did not want a loan, because he could get a loan elsewhere and did not want to be burdened with a repayment obligation. V.B. gave Edouard a total of $70,000.

Eventually, after V.B. adopted a child, the relationship cooled. In approximately November 2009, V.B. called Edouard and told him she knew what he was doing, "that he's trying to get women into counseling for the purpose of trying to have sexual contact with them." Edouard panicked and tried to call or see V.B. at her office, but V.B. refused to have any communication with him for several months. Their sexual relationship ended. V.B. did not report anything to the church elders or the police at the time, because she did not think she would be believed.

S.K. and her husband were also active members of the Covenant Reformed Church when Edouard arrived in 2003. Four years later, when S.K.'s husband happened to be out of the country, Edouard began calling S.K. to check up on her.

S.K.'s father was going through a severe illness at that time and later in 2007 passed away. S.K.'s husband was depressed. S.K.'s daughter was having problems in her marriage. S.K. was feeling down because of her father's death and the troubles in her daughter's marriage. S.K. also learned that her husband had had two affairs. In addition, S.K.'s best friend passed away.

Edouard called S.K. on her cellphone while S.K. was driving and wanted to know how she was doing. S.K. responded that she was not doing very well. S.K. started shaking; she pulled her car over. At this point Edouard made a comment to S.K. that "he would like it if we could be together under the cool, crisp sheets." He added, "You know, if you ever need anybody to talk to, you know, call me. I'll always be there for you." S.K. was shocked by Edouard's comment.

However, some months later, in early 2008, S.K. called Edouard because she "just had absolutely nobody to talk to." Her relationship with her husband was rocky. Edouard sensed something was going on and said, "You can tell me . . . things, and I'll listen." S.K. asked him to come see her, because she wanted to discuss her problems in her marriage with him. At the meeting, she disclosed her husband's affairs to Edouard. After about thirty minutes of conversation, Edouard asked S.K. if he could kiss her. Thereafter, Edouard and S.K. had many meetings where they kissed. They began having sex.

In the spring of 2008, Edouard took S.K. down to the study in the basement of his house. He locked the door, and S.K. thought they would talk. Instead, they had sex. Afterward Edouard told her:

> You will never tell anybody. The elders will never believe you. They will only believe me. I'll make sure everybody knows you're crazy. You'll kill your husband . . . . You'll destroy the church. You'll hurt your family and you will hurt [my family].

S.K. had sexual relations with Edouard a total of six to eight times. S.K. felt that Edouard "had power" over her. "He made me feel like I depended on him," she said.

Eventually Edouard terminated the relationship. But he said to S.K., "Call me if you ever need me or need somebody to talk to, I'll always be there for you night or day."

W.B. and her husband also belonged to Covenant Reformed Church when Edouard became the pastor in 2003. W.B.'s father had been a pastor himself.

In August 2007, W.B. attended a church service alone. Edouard approached her after the service and asked how she was doing. As the conversation progressed, W.B. felt Edouard was flirting with her. During the course of the week, Edouard called again. The discussion was again flirtatious. W.B. could not sleep or eat. She prayed.

On the following Thursday, W.B. asked Edouard for a meeting. She intended to "let him down." It was arranged for the meeting to occur in the office in Edouard's home. Edouard assured W.B. it was fine to come to his home during an evening, as he "counsels women" in his home.

When W.B. arrived, Edouard and his family were there. Edouard took W.B. down to the basement office and locked the door. Edouard asked W.B. very personal questions. Edouard posed "a lot of questions— very concerned about how I was doing, how my father is doing." W.B.'s father had recently been diagnosed with Alzheimer's. W.B. disclosed to Edouard that she had been sexually abused as a child. The conversation lasted a couple of hours. There was no sexual contact.

Edouard and W.B. continued to meet. They had sexually charged conversations. Soon they began to have sex. Edouard told W.B. not to tell anyone because "nobody would understand this. Even if you feel close to your husband some night, never tell him. Never think he's going to understand this." Edouard and W.B. engaged in sexual activity over a

period of years. During the course of her sexual relationship with Edouard, W.B. went to marital counseling with her husband. Edouard asked W.B. to recite what she had been told at the marital counseling sessions and then indicated to W.B. whether or not to follow that advice.

A.B. and her husband were also members of the church when Edouard was appointed pastor. In the spring of 2008, A.B. had a young child with special needs, her mother-in-law had passed away, and she had an overworked husband. As A.B. put it, "My plate was very full." A.B. had seen a physician and had been prescribed an anti-depressant and anxiety medication, which she was taking.

At that time, Edouard called A.B. and asked to set up a meeting. She recounted, "He just wanted to make sure that I was doing okay . . . ." Eventually a meeting was set for a school day in April in Edouard's basement study. Edouard locked the door from the inside. They began with conversation. Edouard probed A.B. on whether she felt stressed. He asked her about her family issues. He asked A.B. whether she had had premarital sex. After a while, Edouard told A.B. that he was very fond of her and "would like to get to know [her] better." Edouard added, "[S]omebody needs to take care of you. You have your hands full." A.B. became uncomfortable. Her feet were trembling.

The encounter ended because A.B. had to leave to pick up her son. But other conversations followed. Edouard told A.B., "I just want you to sit and tell me everything about you." Edouard asked A.B. about her sex life, telling her she could trust him. He frequently asked whether A.B. had been sexually abused as a child. As A.B. put it, "[T]he questions were getting deeper and [he was] getting to know me more and more, I guess knowing my vulnerabilities, . . . where the voids were in my life."

Soon Edouard asked to meet A.B. at her home. After he arrived, he kissed her. Subsequently, Edouard and A.B. called each other many times a day. They kissed and made out. A.B. shared with Edouard that she longed for someone to take care of her. By May 2008 Edouard and A.B. were having sex. This continued at least once a week for the next two-and-a-half years. Edouard advised A.B. that this was a "secret relationship, and we need to keep [it] a secret."

In May 2010, Edouard told A.B. he had something he needed to get off his chest. He disclosed to her that he had had sexual relationships in the past with V.B. and S.K. V.B. is A.B.'s sister-in-law. A.B. was "devastated and shocked." She "had a very difficult time." Yet Edouard and A.B. continued their sexual relationship. According to A.B., "[H]e was just constantly always evaluating me."

In December 2010, A.B.'s husband arrived at home as Edouard and A.B. were having sexual relations. He saw Edouard's vehicle and became suspicious. He spoke to his own brother (V.B.'s spouse) and the two of them put the stories together. Then A.B.'s husband went to the elders of the church.

Edouard resigned immediately. He called S.K. and informed her he had resigned because he had been caught kissing the hand of another woman. He reminded her not to disclose their sexual relationship. He also called W.B. and told her he had resigned because two affairs had come to light. He told W.B., "If anybody says you're one of them, just deny it. I will never tell anybody, and this will all blow over. I love you." He made W.B. role-play and rehearse her denials.

Edouard was charged with three counts of sexual abuse in the third degree in violation of Iowa Code section 709.4(1), four counts of sexual exploitation by a counselor or therapist in violation of section

709.15(2)(*c*), and one count of engaging in a pattern or practice of sexual exploitation by a counselor or therapist in violation of section 709.15(2)(*a*).

Following a change of venue, the case went to trial in Dallas County, commencing August 13, 2012. Each of the four victims testified. Edouard and his wife testified for the defense. Edouard acknowledged having sexual relations with all four women, but maintained that it was consensual. Edouard denied having provided mental health services to any of the women.

The jury found Edouard not guilty on the three sexual abuse charges, but guilty on the five sexual exploitation charges. He was sentenced to one year imprisonment on each of the Iowa Code section 709.15(2)(*c*) counts, with the sentences to run consecutively. He was sentenced to five years imprisonment on the section 709.15(2)(*a*) count, with the sentence to run concurrently with the section 709.15(2)(*c*) sentences. Edouard timely appealed.

On appeal, Edouard argues: (1) the evidence was insufficient to prove that he provided mental health services to V.B., S.K., W.B., or A.B.; (2) the district court erred in denying his discovery request for W.B.'s counseling records; (3) the sexual exploitation statute is unconstitutional as applied to him; (4) the district court abused its discretion in excluding expert testimony relating to the differences between pastoral counseling and pastoral care; (5) the district court erred in excluding certain fact evidence; (6) the district court erred in omitting certain jury instructions; and (7) the district court erred in the computation of restitution.

We transferred the case to the court of appeals, which reversed and remanded for a new trial. The court of appeals found the district court had failed to properly instruct the jury on the "mental health

services" element of the sexual exploitation counts and had wrongfully excluded Edouard's proposed expert testimony. The State applied for further review, and we granted the application.

## II. Standard of Review.

"We review challenges to jury instructions for correction of errors at law." *State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013). The related claim that the district court should have given a requested instruction is reviewed for abuse of discretion. *Id.*

Constitutional challenges to the district court's discovery rulings are reviewed de novo. *State v. Thompson*, 836 N.W.2d 470, 476 (Iowa 2013); *State v. Cashen*, 789 N.W.2d 400, 405 (Iowa 2010), *superseded by statute*, 2011 Iowa Acts ch. 8 § 2. We likewise review de novo challenges to a statute's constitutionality. *Thompson*, 836 N.W.2d at 483. Statutes are presumed to be constitutional. *Id.*

The district court's rulings on the admissibility of evidence are reviewed for abuse of discretion. *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). Additionally, "[w]e review challenges to the sufficiency of the evidence for correction of errors at law." *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). Finally, restitution orders are reviewed for correction of errors at law. *State v. Hagen*, 840 N.W.2d 140, 144 (Iowa 2013).

## III. Analysis.

We begin our consideration of Edouard's appeal with the instructional and evidentiary issues that were the basis of the court of appeals' reversal and remand.

**A. Jury Instructions.** According to the Iowa Code:

> 2. Sexual exploitation by a counselor or therapist occurs when any of the following are found:

. . . .

> (*c*) Any sexual conduct with a patient or client or former patient or client within one year of the termination of the provision of mental health services by the counselor or therapist for the purpose of arousing or satisfying the sexual desires of the counselor or therapist or the patient or client or former patient or client . . . .

Iowa Code § 709.15(2)(*c*). Sexual exploitation by a counselor or therapist within the meaning of section 709.15(2)(*c*) is considered a serious misdemeanor. *See id.* § 709.15(4)(*c*). Additionally, it is a class "D" felony for a counselor or therapist to engage in a "pattern or practice or scheme of conduct" of sexual exploitation. *See id.* § 709.15(2)(*a*), (4)(*a*).

The statute defines "counselor or therapist" as follows:

> "*Counselor or therapist*" means a physician, psychologist, nurse, professional counselor, social worker, marriage or family therapist, alcohol or drug counselor, member of the clergy, or any other person, whether or not licensed or registered by the state, who provides or purports to provide mental health services.

*Id.* § 709.15(1)(*a*).

Thus, Iowa law makes it a crime for *anyone* who provides "mental health services" to another person to engage in sexual conduct with that person while the mental health services are being provided or within one year thereafter. *Id.* § 709.15(1)(*a*), (2)(*c*). The law does not require the defendant to have any particular status. *Id.* § 709.15(1)(*a*). The defendant, for example, need not be a professional or a clergyperson. *Id.* All that is required is that the defendant (1) provided "mental health services" to a person and (2) engaged in sexual conduct with that person less than one year later. *Id.* § 709.15(1)(*a*), (2)(*c*).

The statute in turn defines "mental health services" to mean "the treatment, assessment, or counseling of another person for a cognitive,

behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction." *Id.* § 709.15(1)(*d*).

We have considered and rejected vagueness and overbreadth challenges to this law in the past. In *State v. Allen,* we affirmed the conviction of a hypnotherapist who engaged in sexual conduct with a patient, while rejecting a vagueness and overbreadth challenge to the statute. 565 N.W.2d 333, 337–38 (Iowa 1997). The defendant there had fondled the victim and attempted sexual intercourse with her during hypnotherapy sessions, which also involved the provision of alcoholic beverages and readings of Tarot cards. *Id.* at 335. We reasoned that the statute did not reach a substantial amount of protected conduct because "[a] person of ordinary intelligence could understand that the term 'mental health services' . . . does not encompass strictly personal relationships involving the informal exchange of advice" and would rarely if ever "apply to a marriage relationship." *Id.* at 337–38.

In *State v. Gonzalez,* we reversed the dismissal of a trial information charging a psychiatric nursing assistant with violating the statute. 718 N.W.2d 304, 305 (Iowa 2006). According to the information, the defendant had inappropriately touched a female patient's genital area. *Id.* Accepting the facts in the information as true, we found it sufficient to allege criminal conduct. *Id.* at 308–09. The defendant had provided "treatment" because he "performed nursing tasks to assist in providing care of psychiatric patients" and "assessment" because he "performed nursing tasks to assist in monitoring psychiatric patients." *Id.* at 308. In dicta we also quoted a definition of "counseling" from Webster's dictionary, stating that the term means:

> "a practice or professional service designed to guide an individual to a better understanding of his problems and potentialities by utilizing modern psychological principles and methods esp. in collecting case history data, using various techniques of the personal interview, and testing interests and aptitudes."

*Id.* at 308 (quoting *Webster's Third New Int'l Dictionary* 518 (unabr. ed. 2002)). Our opinion, however, did not address whether the defendant had provided counseling.

We also rejected vagueness and overbreadth challenges in *Gonzalez.* Regarding vagueness, we explained:

> Any person who renders "treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction" provides " '[m]ental health service.' " *Id.* § 709.15(1)(*d*). There is no doubt the language of section 709.15 applies to the services Gonzalez is alleged to have provided to the female patient under the facts in the trial information and attached minutes. Therefore, we conclude Gonzalez's vagueness claim is without merit.

*Id.* at 310. We then refused to find the statute overbroad because Gonzalez had not identified any protected conduct. *Id.*

Edouard does not ask us to reexamine *Allen* or *Gonzalez.* He does not argue on appeal that the statute is void for vagueness or overbroad. Instead, we are asked to decide whether the district court's sexual exploitation jury instructions were proper.

Here, for each alleged victim, the district court instructed the jury as follows:

> The State must prove each of the following elements of Sexual Exploitation by a Counselor or Therapist as to [alleged victim]:
>
> 1. On or about [relevant time period], the defendant engaged in sexual conduct with [alleged victim].

2. The defendant did so with the specific intent to arouse or satisfy the sexual desires of either the defendant or [alleged victim].

3. The defendant was then a counselor or therapist.

4. [Alleged victim] was then receiving mental health services from the defendant, or had received mental health services from the defendant within one year prior to the conduct.

Additionally, the court instructed the jury that "a 'counselor or therapist' includes a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide mental health services."

Finally, in Instruction 25, the court provided the jury with the following definition of "mental health services":

As used in element number 4 of Instructions No. 18, 19, 20, and 21, 'mental health services' is the providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intrapersonal or interpersonal dysfunction. It does not include strictly personal relationships involving the informal exchange of advice, nor does it include the giving of general spiritual advice or guidance from a clergy member to congregants. It contemplates a counseling relationship with the clergy member established for the purpose of addressing particular mental, intrapersonal or interpersonal dysfunctions.

Thus, the jury was not only given the statutory definition of mental health services, *see* Iowa Code § 709.15(1)(*d*), the jury was also told—consistent with *Allen*—that mental health services do not involve informal advice. Additionally, in Instruction 25, the district court excluded general spiritual advice or guidance from the definition of mental health services. And Instruction 25 required the State to prove a counseling relationship, not merely some counseling.

In crafting this instruction, the district court went beyond the Iowa State Bar Association Criminal Jury Instruction, which simply restates

the statutory definition of mental health services. *See* Iowa State Bar Ass'n, *Iowa Crim. Jury Instruction* 920.5 (2013). Essentially, the district court adopted a middle position between the parties. The State had asked that only the ISBA instruction be given. The defendant had requested the following additions to the ISBA instruction:

> Counseling means a practice or professional service designed to guide an individual to a better understanding of his or her problems and potentialities by utilizing modern psychological principles and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes.

> Mental health services does not mean mere spiritual advice or guidance provided by a member of the clergy. Nor does it encompass strictly personal relationships involving the informal exchange of advice.

The district court, as can be seen, incorporated some of the defendant's proposals (i.e., the second paragraph) but not all of them (i.e., the first paragraph).

Edouard argues that his definition of counseling, drawn from certain language in *Gonzalez*, should have been included in the court's jury instructions. "[T]he court is required to give a party's requested instruction so long as it states a correct rule of law having application to the facts of the case and when the concept is not otherwise embodied in other instructions." *State v. Becker*, 818 N.W.2d 135, 141 (Iowa 2012) (internal quotation marks omitted). However, "the court is not required to give any particular form of an instruction; rather, the court must merely give instructions that fairly state the law as applied to the facts of the case." *Id.* (internal quotation marks omitted).

There is no dispute the district court provided the jury with Iowa Code section 709.15(1)(*d*)'s complete definition of "mental health services." What the court did not do is go a step further. That is, the

district court did not tell the jury what the word "counseling," as used in that statutory definition, meant. "Counseling" is not defined in the statute. Edouard contends the jury should have been told counseling is limited to "modern psychological principles and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes."[3] Edouard, in other words, wanted the jury to be told that in order for him to be convicted, any "counseling" he provided had to have been based upon a modern psychological approach.

We have said:

> In criminal cases, the court is required to instruct the jury on the definition of the crime. Generally understood words of ordinary usage need not be defined; however, technical terms or legal terms of art must be explained.

*State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996) (citation omitted). "Counseling" is certainly a word of ordinary usage. Thus, it did not need to be specially defined for the jury unless the legislature meant to use it in a technical way in section 709.15 or viewed it as a "legal term of art." We do not believe the legislature had such a view of "counseling."

"[S]tatutes must be read in their entirety." *State v. DeSimone*, 839 N.W.2d 660, 666 (Iowa 2013). Read as a whole, Iowa Code section 709.15 does not appear to use the term "counseling" in a technical or specialized way. To the contrary, the statute expressly covers members of the clergy. *See* Iowa Code § 709.15(1)(*a*). These individuals typically do not perform psychotherapy or use "modern psychological principles

---

[3]In his brief, Edouard concedes this is not the only dictionary definition of "counseling."

and methods especially in collecting case history data, using various techniques of personal interview, and testing interests and aptitudes."

Additionally, the statute by its terms does *not* require that the defendant be "licensed or registered by the state," and it covers even persons who merely "purport[] to provide mental health services." *Id.* This again suggests that the legislature did not intend a strict definition of counseling limited to modern psychological principles and methods, so long as the individual was addressing "a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction." *See id.* § 709.15(1)(*d*).

Furthermore, we do not believe our prior section 709.15 caselaw supports Edouard's requested jury instruction. In *Allen* we affirmed the conviction of a hypnotherapist who plied his victim with alcohol and Tarot cards. *See* 565 N.W.2d at 335. While we excluded mere informal advice from the coverage of the statute, we did not say that the use of "modern psychological principles and methods" was required. *See id.* at 337. To the contrary, the defendant there was a charlatan who used (or purported to use) some of the oldest methods in the book—hypnotism, adult beverages, and fortune telling. *See id.* at 335.

*Gonzalez*, as noted, did not involve "counseling." *See Gonzalez*, 718 N.W.2d at 308. In addition, although we quoted some dictionary definitions of statutory terms, we did so to demonstrate the defendant's conduct was covered by the statute, not to indicate those definitions set forth the outermost limits of the law. *See id.*

Notably, when we rejected the argument later in *Gonzalez* that the statute was unconstitutionally vague, we reverted to the *statutory* definition of "mental health services," not to any of the *dictionary* definitions we had previously quoted. *See id.* at 310. Had we intended

the dictionary definitions to be a required gloss on the statute, we logically would have repeated them and relied on them in discussing the vagueness question. Thus, we do not read *Gonzalez* as endorsing a definition of "counseling" limited to "modern psychological principles and methods."

For these reasons, we reject Edouard's challenge to Instruction 25. Edouard's other challenges to the jury instructions are less substantial. He contends the jury should have been told that each alleged victim had to have been his "patient or client" in order to sustain a guilty verdict. This argument is purely form over substance, because the statute defines a "patient or client" as "a person who receives mental health services from the counselor or therapist," *see* Iowa Code § 709.15(1)(*e*), and the jury was told that each of the alleged victims had to have "receiv[ed] mental health services" from Edouard.

Edouard also urges that the jury should have been given a list of "all the enumerated professions" referenced in section 709.15(1)(*a*), including those which had no applicability to the case, such as physicians, psychologists, nurses, professional counselors, social workers, marriage or family therapists, and alcohol or drug counselors. *See id.* § 709.15(1)(*a*). Instead, the jury was just told that "a 'counselor or therapist' includes a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide mental health services." We see no error. The district court's instruction was an accurate statement of the law; it left out only those portions of the statute that had no bearing on the case.

**B. Expert Testimony.** At trial, Edouard tried to offer testimony from a forensic psychiatrist, Dr. Hollida Wakefield, describing differences between "pastoral care" and "pastoral counseling." In an offer of proof,

Dr. Wakefield testified there is a difference between pastoral care and pastoral counseling that is "recognized and accepted generally in the . . . theological community." Dr. Wakefield testified that pastoral care occurs when

> somebody comes with a specific problem, you get an idea of what the problem is, you formulate a treatment plan, you meet with the person in a structured way. It is usually time limited. It doesn't go on for months and years.

Based on her review of the depositions given by the four women, Dr. Wakefield concluded Edouard's interactions with them did not "fit the definition of pastoral counseling."

The district court refused to allow the testimony. It reasoned it was the court's duty

> to instruct the jury on what the law is regarding mental health services and counseling . . . and that it is the function of the jury to determine whether the defendant's conduct did or did not constitute the provision of mental health services by a counselor or therapist.

It excluded Dr. Wakefield's testimony "regarding pastoral care or pastoral counseling" because "neither . . . are a part of the elements of this case."

The admissibility of expert testimony in a criminal case "falls squarely within the trial court's sound discretion." *State v. Hulbert*, 481 N.W.2d 329, 332 (Iowa 1992). Upon our review, we do not believe the court abused its discretion. Here, in effect, the defendant wanted to call an expert to provide the defendant's own definition of the crime, and then to explain the defendant had not committed it.

Even if the theological community were in agreement that Edouard's actions did not amount to pastoral counseling, that would not resolve whether Edouard's actions fit within the statutory definition of mental health services. *See, e.g., People v. Littlejohn*, 494 N.E.2d 677,

686 (Ill. App. Ct. 1986) (noting the district court improperly allowed evidence by a doctor that confused the jury as to the legal definition of insanity by testifying to a "definition [that] may have medical meaning to clinicians," but "clearly [did] not comport with Illinois definition of insanity for legal purposes"); *State v. Williams*, 431 So. 2d 885, 888–89 (La. Ct. App. 1983) (upholding the convictions of the defendant, a prison inmate, on one count of forcible rape and one count of attempted forcible rape against a fellow inmate and rejecting the defendant's argument that the trial judge had erred in excluding the defendant's expert witness testimony about "the relationship between prison security and consensual versus nonconsensual sex"); *State v. Spano*, 745 A.2d 598, 601–02 (N.J. Super. Ct. App. Div. 2000) (upholding the exclusion of expert testimony on the meaning of "worrying" in a statute which allowed a person to kill a dog if it was "worrying" a domestic animal and affirming the defendant's conviction).

In 1925, we considered the appeal of an osteopath who, under the statutes of that time, had been convicted of practicing medicine without a license. *See State v. Gibson*, 199 Iowa 177, 178, 201 N.W. 590, 590 (1925). The defendant argued on appeal the trial court had erred in excluding expert testimony as to the technical meaning of "internal curative medicine." *Id.* We rejected the appeal, reasoning the words "do not import a technical meaning," and therefore the expert testimony was properly excluded. *Id.* at 178, 180, 201 N.W. at 590, 591. The same basic principles concerning admissibility of expert testimony apply today.

In order for the expert testimony to be admissible, it must "assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. In other words, it must add something to the jury's determination of whether Edouard's actions fell within the legal

definition of mental health services. The specialized meaning given to a term by the theological community is ultimately beside the point in determining whether Edouard's actions met the legislature's definition of the crime. Notably, Dr. Wakefield's indicia of pastoral counseling—i.e., the existence of a "treatment plan," the "structured" meetings, and presence of time limitations—do not appear anywhere in section 709.15. Hence, the district court did not abuse its discretion in excluding Dr. Wakefield's proposed testimony.

**C. Sufficiency of the Evidence.** Edouard also contends there is insufficient evidence to sustain a guilty verdict on any of the charges. In particular, he disputes the sufficiency of the evidence that he provided mental health services as defined in Iowa Code section 709.15(1)(*d*) to any of the four women.

> In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. [W]e will uphold a verdict if substantial record evidence supports it. We will consider all the evidence presented, not just the inculpatory evidence. Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence.

*State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) (citations omitted) (internal quotation marks omitted).

We begin by noting a few common facts. All four women were members of Covenant Reformed Church; Edouard had been their pastor for several years. Three of the four had preexisting marital problems in addition to other difficulties in their personal lives. The fourth developed such problems after getting involved with Edouard, who claimed to be

resolving them. Two of the four went to Edouard's office initially thinking they would receive help from him, and Edouard quickly ended up having sex with both of them (one of them in the office that day). Before and during his sexual encounters with each of the four women, Edouard asked each of them deeply personal and probing questions, purporting to guide them through their personal difficulties.

We now review the evidence specifically relating to V.B. She was "really struggling with going through" with an international adoption of four siblings. She decided to see her pastor, Edouard, to discuss these issues and her own infertility.

Edouard was immediately receptive. He responded, "I've told you, you can talk to me anytime." He invited her to his office, where he asked her how she was doing. V.B. explained that she was "really struggling" and that it was a "horrible, painful time" for her. After that, Edouard moved into questioning about V.B.'s marriage and whether her husband was "meeting her needs." V.B. began to cry. Regarding her relationship with her husband, V.B. told Edouard that "[i]t was hard that we were both hurting and not able to hurt together, to connect together and hurt through it; that we just seemed like we were separate. It was hard." By the end of the meeting, Edouard was having sexual relations with V.B.

V.B. added that in her faith and the way she was raised, "[w]e just didn't go to outside counselors . . . . [Y]ou would go to the elder or the pastor and that was it."

S.K., like V.B., was experiencing marital problems when she decided to call Edouard as a result of "all the stresses in [her] life." She had previously sought counseling from Edouard after her daughter had been sexually abused by another member of the congregation. Her husband had recently confessed infidelities to her. S.K. felt their

"relationship was rocky," and that she "had absolutely nobody to talk to." In addition to the marital problems S.K. was suffering, she was also coping with the recent death of her best friend. Edouard "sensed something was going on," and Edouard explained to S.K. she could tell him "things, and [he would] listen." They set up a meeting at her house to discuss these stressors in her life. S.K. revealed to Edouard her husband's infidelities in that meeting. S.K. "was relieved that [she] could tell somebody, that he's the pastor; that [she] could confidentially talk to him about what was going on." They continued to meet at her house. At these ensuing meetings, they were physically intimate, and, S.K. testified, they would talk, because she "would want to talk," and felt she "needed somebody to talk to."

Edouard's relationship with W.B. began in a different fashion. Some flirtatious conversation between the two of them had occurred. W.B. telephoned Edouard to set up a meeting to put an end to things. When she asked in the course of that telephone conversation whether it was "normal and acceptable" for Edouard to meet with women in his office, "he said yes, he counsels women at his home, and . . . it was just fine" for her to meet there.

At the office meeting, Edouard asked "a lot of questions—very concerned about how I was doing, how my father is doing." Her father had recently been diagnosed with Alzheimer's. The questions quickly became more personal, and W.B. eventually revealed in the meeting that she had been abused physically and sexually as a child. Edouard probed that topic more deeply, she explained, as "[h]e was interested in it. He wanted to know the dynamics." Soon thereafter, Edouard began to have a sexual relationship with W.B. This led W.B. to seek marital

counseling. Edouard would ask W.B. about what the marital counselor had said, and then tell W.B. whether to follow that advice or not.

We turn finally to A.B. Edouard inquired as to how she was doing and how she was "juggling everything." He asked if she "would like to set up a meeting with him." Even though she testified she was not suffering from a mental disease or dysfunction at the time of their initial meeting, A.B. also testified she was taking depression and anxiety medication at the time and had various stressors in her life. She agreed to meet with Edouard in his home office. She perceived this meeting to be a "counseling session, something [she] could go to that he was . . . a pastor[.]" The conversation in that initial meeting, she testified, started out with "typical conversation." Edouard asked gradually more probing questions, such as, "Do you feel stressed? Do you feel upset?" A.B. testified she was "very open with him" because "it [was] all supposed to be confidential," so she "definitely shared with him the ins and outs of how it felt to be a mom and taking care of everyone." As the conversation progressed, Edouard began to ask even more "dig-deep kind of questions," inquiring, for example, about her relationship with her husband. Many of the questions made her feel uncomfortable, and she left the meeting "[c]onfused and very nervous."

A.B. immediately called her sister, and reported, "I just got done with a counseling session with Pastor Edouard, and I—it went fine, but at the end, it was just odd." Edouard continued to have meetings with A.B., and Edouard continued to ask her probing questions, often of a kind that made her feel uncomfortable. She described these questions as "intellectual" and "constantly-thinking questions that no one has ever asked me before." A.B. characterized Edouard's inquiries as "digging and

finding out [her] vulnerabilities." By this time, they were having sexual relations.

We find sufficient evidence to sustain Edouard's convictions on all of the sexual exploitation counts. There is substantial evidence that he counseled each of the four women for an "emotional . . . or social dysfunction, including an intrapersonal or interpersonal dysfunction." *See* Iowa Code § 709.15(1)(*d*). As required by the district court's jury instructions, this went beyond an "informal exchange of advice," or "the giving of general spiritual advice or guidance from a clergy member to congregants."[4] There is substantial evidence that a relationship was established between Edouard and each victim, at least initially, "for the purpose of addressing particular mental, intrapersonal or interpersonal dysfunctions." To some extent, as in *Allen*, it appears sexual contact was part of Edouard's program of pseudotherapy and treatment for his victims.[5]

**D. Production of Mental Health Records.** The four victims in this case participated in group therapy sessions after Edouard's conduct came to light and he resigned from the church. V.B., S.K., and A.B. voluntarily agreed to waive any privilege with respect to the records of these sessions. W.B. did not. Nonetheless, the district court ordered their production and they are not at issue on appeal.

W.B. also went through marital counseling while she was still seeing Edouard. She underwent additional counseling thereafter. She declined to waive the privilege as to those records. Edouard argues the

---

[4]Instruction 25, which we have upheld, is the law of the case for sufficiency-of-evidence purposes. *See, e.g.*, *State v. Merrett*, 842 N.W.2d 266, 275 (Iowa 2014).

[5]According to V.B., Edouard advised her that she had "all this sexual energy that needed to be released, and he had to be there to protect me."

records were relevant to show that W.B. was not suffering from "a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction," Iowa Code § 709.15(1)(*d*), and therefore Edouard could not have been providing mental health services to her. *See id.*

The district court denied Edouard's motion for access to the records and found he had not met the burden under *Cashen* or Iowa Code section 622.10 to show at least a reasonable probability that these records "contain something that may be exculpatory." *See* Iowa Code § 622.10; *Cashen*, 789 N.W.2d at 405. Edouard argues the district court improperly applied *Cashen*, and as a result, prejudice is presumed. He insists the denial of the access to the records violated his right to due process.

This court developed the *Cashen* protocol to determine whether a criminal defendant should have access to the mental health records of a victim. *See Cashen*, 789 N.W.2d at 408–10 (requiring a defendant to make a good faith showing that there is a "reasonable basis to believe the records are likely to contain exculpatory evidence tending to create a reasonable doubt as to the defendant's guilt"); *see also Thompson*, 836 N.W.2d at 479–80 (discussing the *Cashen* protocol). However, a 2011 change in the Iowa Code superseded *Cashen* by providing a defendant seeking to obtain privileged records must:

> demonstrat[e] in good faith a reasonable probability that the information sought is likely to contain exculpatory information that is not available from any other source and for which there is a compelling need for the defendant to present a defense in the case.

Iowa Code § 622.10(4)(*a*)(2)(a); *see* 2011 Iowa Acts ch. 8, § 2 (amending the statute); *Thompson*, 836 N.W.2d at 481, 490 (recognizing the

amendment as a "reaction to *Cashen*" and upholding the amended statute as constitutional on its face). This amendment was in effect at the time of the hearing on the motion for subpoena, and thus controls in this case.

We discussed section 622.10(4)(*a*)(2)(a) in length in *Neiderbach*, 837 N.W.2d at 195–98. In *Neiderbach*, the defendant and codefendant were charged with child endangerment after the victim, their son, suffered a number of injuries, including permanent brain damage, over a three-week period shortly after his birth. *Id.* at 187–89. We concluded the district court erred by failing to conduct an in camera inspection of the codefendant's medical records sought by Neiderbach under section 622.10(4)(*a*)(2)(a). *Id.* at 197. We noted the codefendant's credibility was "a central issue" in the case and Neiderbach's "defense strategy included raising reasonable doubt whether certain injuries may have been inflicted by [the codefendant] instead of him." *Id.* Because the codefendant gave inconsistent statements, concocted a false story with Neiderbach to present to hospital staff, and behaved strangely in jail, we concluded the defendant " 'demonstrate[d] in good faith a reasonable probability that the information sought . . . is likely to contain exculpatory evidence . . . and for which there is a compelling need for [the defendant] to present a defense' within the meaning of section 622.10(4)(*a*)(2)(a)." *Id.* at 197 (quoting Iowa Code § 622.10(4)(*a*)(2)(a)). We observed that the records of her mental health counselor "may very well have enabled defense counsel to more effectively cross-examine her at trial or assisted counsel's preparation for her deposition." *Id.* at 198.

However, despite our conclusion, we declined to reverse Neiderbach's conviction outright. *Id.* Rather, we entered the following order:

Accordingly, we reverse the district court's ruling denying [Neiderbach]'s motion for an in camera review of [the codefendant]'s mental health records and remand the case for the district court to conduct that review pursuant to section 622.10(4)(*a*)(2). If the district court finds no exculpatory evidence on that review, [Neiderbach]'s remaining convictions shall remain affirmed. If exculpatory evidence is found, the district court shall proceed as directed in section 622.10(4)(*a*)(2)(c) and (*d*) and determine whether [Neiderbach] is entitled to a new trial.

*Id.*

We recognize that this case presents a different set of facts than *Neiderbach*. Rather than seeking the records of a testifying codefendant, here Edouard seeks the counseling records of one of his alleged victims. Even after the legislature's adoption of section 622.10, we reiterated our recognition of the "importance of maintaining confidentiality in mental health treatment." *Thompson*, 836 N.W.2d at 483. In reviewing the constitutionality of the legislature's policy choices contained in section 622.10(4), we stressed a "victim–patient's constitutional right to privacy in her mental health records" was protected, in part, by the legislature's choice "to have a neutral judge review the victim's private records, rather than the advocate for the alleged abuser." *Id.* at 487. We determined this protection, along with others contained in the statute, was a constitutional way "to balance the competing rights of criminal defendants and their victims." *Id.* at 490.

Having said that, we believe a similar approach to the one we took in *Neiderbach* is warranted in this case. W.B. testified that during her sexual relationship with Edouard, she was also going through marital counseling at a counseling center. Edouard's counsel used this fact to close her cross-examination of W.B. with a flourish:

Q. You and your husband don't go to marital counseling with [Edouard]? A. Correct.

Q. You go to Pine Rest? A. Right.

Q. And Pine Rest is a counseling center? A. Yes.

Q. And that's what they do there, is they have Christian counselors, right? A. Yes.

Q. So you never do actually go to Mr. Edouard for your counseling? A. Right.

The defense did not ask W.B. about the *content* of her marital counseling sessions. However, needing to rehabilitate W.B., the State then got her to testify on redirect that Edouard went over the same matters with her that her marital counselor had covered with her:

Q. After you would have a session at Pine Rest with the marriage counselor, would you tell Pastor Edouard what the counseling session was about? A. Yes.

Q. Would he ask you? A. Yes.

Q. Would he ask you lots of questions about the counseling session? A. Yes.

Q. And would you answer his questions? A. Yes.

Q. What kind of questions would he ask about a counseling session at Pine Rest that you attended with your husband? A. He wanted to know all the dynamics. He wanted to know what we said, what she said.

Q. Who is "she"? A. The counselor.

Q. And would you tell him specifics about what she said and what the two of you talked about with her? A. Yes.

Q. Would you share with him—you said "the dynamics." What do you mean by that? A. What did I say?

Q. You said something about "the dynamics" of the session, he would ask about the dynamics. A. What was said.

Q. And would you—if the counselor gave you and your husband a piece of advice that was supposed to help you, did he ask you whether the counselor gave you advice? A. Yes.

Q. And would you tell him? A. Yes.

Q. Would he express an opinion on whether he agreed with that? A. Yes.

Q. Would he advise you whether to follow the advice of that counselor at Pine Rest or not? A. Yes.

Q. Could you explain that? Give us an example. A. There was oftentimes he did not like the advice that she gave, and he would tell me a different way to do it or "Just don't listen to her."

Q. And then would you do it her way or his way? A. His way.

This sequence involving two talented trial lawyers demonstrates that Edouard's quest for W.B.'s mental health records was clearly more than a fishing expedition. *Cf. Thompson*, 836 N.W.2d at 490 (noting the absence of "a nexus between the issues at trial and the mental health treatment received by [the victim]"). Nevertheless, the State argues the records were not likely to contain exculpatory information for two reasons. First, the State points out that W.B. consistently admitted her mental health was fine in 2007 before she started seeing Edouard. Thus, it contends Edouard did not need those records to establish the absence of a dysfunction. Second, the State urges that the existence or lack of a diagnosis is irrelevant to whether Edouard provided "mental health services."

We disagree with the State. Although W.B. admitted her mental health was fine before her sexual relationship with Edouard began, she described having personal difficulties thereafter. Counseling records for the time period when W.B. was seeing Edouard and shortly thereafter would be potentially relevant to the extent they touch upon the nature and extent of those problems. And while the State insists that a diagnosed dysfunction is not a required element of the crime, the lack of diagnosis for such a dysfunction would seem to us an appropriate

subject for jury argument. In its closing, the State argued with respect to W.B.:

> What is a mental health service? ". . . . The providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intrapersonal or interpersonal dysfunction."
>
> In other words, she's having personal problems, and [Edouard's] counseling her for those problems. That's what all that fancy language is.

In short, the State argued to the jury that dysfunction means nothing more than "personal problems." But a defendant should have latitude to argue it means something more than that. Perhaps W.B.'s counseling records would have assisted Edouard in fashioning an argument that W.B. was not suffering from a dysfunction during any relevant time period.

In addition to showing a reasonable probability the records might likely contain exculpatory information necessary to his defense, Edouard also had to show the information "is not available from any other source." *See* Iowa Code § 622.10(4)(*a*)(2)(a). We previously pointed out in *Neiderbach* that, under certain circumstances, information is not "available" from another source just because testimony can be obtained from the patient or client. 837 N.W.2d at 197–98. We believe this is another one of those situations. Information in the counseling records could have significantly undermined W.B.'s testimony. We do not know.

Therefore, we reverse the district court's ruling that denied Edouard's request for in camera review of W.B.'s counseling records. We emphasize the limits of this decision. The crime charged requires the State to show the defendant counseled W.B. for a dysfunction, and the record shows W.B. was receiving outside counseling at the same time

and shortly thereafter.  Also, as in *Neiderbach*, if the district court finds no exculpatory evidence, Edouard's convictions will stand affirmed.  *See* 837 N.W.2d at 198 & n.3.  If exculpatory evidence is found, the district court would then determine if a new trial is required on the Iowa Code section 709.15(2)(*c*) count relating to W.B. and the section 709.15(2)(*a*) pattern or practice count.

**E.  Constitutional Challenges**.  Edouard raises two constitutional challenges as a part of his appeal.  First, he contends that section 709.15(2), as applied to him, unconstitutionally burdens his fundamental right to enter into sexual relationships.  He maintains that section 709.15(2) "creates a per se ban on all sexual relations between certain categories of individuals regardless of the existence or nonexistence of consent," and that "[i]mplicit in the jury's verdict finding Edouard not guilty of sexual abuse in the third degree is the conclusion that his sexual relationships with all four women were consensual."  In Edouard's view, section 709.15(2) is not narrowly tailored to address a compelling interest using the least restrictive means possible.

Edouard refers to the Due Process Clauses of both the United States Constitution and the Iowa Constitution in his brief.  However, he does not advance a separate analysis under the Iowa Constitution.  For this reason, we will undertake the same analysis for both claims.  *See State v. Kennedy*, 846 N.W.2d 517, 522 (Iowa 2014) (stating that "[w]e jealously protect this court's authority to follow an independent approach under our state constitution for provisions of the Iowa Constitution that are the same or nearly identical to provisions in the United States Constitution" but choosing not to interpret the Iowa Constitution any differently from the United States Constitution where the defendant had

not proposed a specific test under the Iowa Constitution (internal quotation marks omitted)).

In *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003), the United States Supreme Court overturned the convictions of two male adults for engaging in consensual sexual conduct. The Court found the defendants were "free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." *Id.* at 564, 123 S. Ct. at 2476, 156 L. Ed. 2d at 516. Edouard cites us to *Lawrence*, but it is important to note that *Lawrence* "does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused." *Id.* at 578, 123 S. Ct. at 2484, 156 L. Ed. 2d at 525. By contrast, Lawrence involved "two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." *Id.*

In *State v. Musser*, we rejected a constitutional privacy challenge to Iowa's statute making it a felony for a person knowing he or she was HIV positive to engage in intimate conduct with another person who was not aware of that status. *See* 721 N.W.2d 734, 748 (Iowa 2006). We found that *Lawrence* was "readily distinguishable" because there was "*not* 'full and mutual consent'" where one sexual partner was unaware of the other's infected status. *Id.* (quoting *Lawrence*, 539 U.S. at 578, 123 S. Ct. at 2484, 156 L. Ed. 2d at 525). "Consent in the absence of such knowledge is certainly not a full and knowing consent as was present in *Lawrence*." *Id.* We also observed that "the sexual partner of an infected person is at serious risk of injury and even death from the prohibited sexual contact." *Id.*

To some extent, the distinctions we recognized in *Musser* also exist here. Based upon their testimony, the relationships between Edouard and each of the four women did not involve full and mutual consent. In each case, Edouard used—misused—his position of authority as a counselor to exploit the vulnerabilities of his victim. The relationships were of a kind where "consent might not easily be refused." *Lawrence,* 539 U.S. at 578, 123 S. Ct. at 2484, 156 L. Ed. 2d at 525.

And the women suffered harm. Following her experience with Edouard, A.B. was "scared" and "struggling." She later wrote the word "Freedom" in her husband's notebook because "[t]he longer you're out of [Edouard's] grip, the more freedom you get." V.B. felt it "was hard to keep going" after her experience with Edouard and was afraid of "[l]osing everything" because she felt no one would believe her over him due to his reputation in the congregation. S.K. was "trapped," and felt that Edouard was "a ball and chain." After Edouard was exposed, W.B. "couldn't eat" and was "losing weight."

Edouard is not the first person to assert that any sexual exploitation laws that criminalize consensual sexual relations between adults are unconstitutional. Similar arguments have been raised, generally without success, in other jurisdictions. For the most part, the courts have reasoned that the statutes do not implicate fundamental rights and are not controlled by *Lawrence* because the relationship is imbalanced and not fully consensual. *See, e.g., State v. Freitag,* 130 P.3d 544, 545–46 (Ariz. Ct. App. 2006) (rejecting an argument that prostitution was protected by a "fundamental constitutional right to engage in adult consensual sexual conduct" as recognized in *Lawrence*); *Talbert v. State,* 239 S.W.3d 504, 511–13 (Ark. 2006) (upholding a statute that prohibits a member of the clergy from using his or her

position of trust and authority to engage in sexual activity with a victim and finding *Lawrence* distinguishable); *State v. Edwards*, 288 P.3d 494, 498–503 (Kan. Ct. App. 2012) (finding a statute that prohibited a teacher from engaging in sexual activity with an eighteen-year-old student was subject to a rational basis review, noting, "[w]hen read in its entirety, it is clear that the intent of this statute is to prohibit sexual conduct of certain persons who have authority over other persons where the ability to freely consent is questionable"); *State v. Lowe*, 861 N.E.2d 512, 515–18 (Ohio 2007) (determining that *Lawrence* did not apply and the defendant did not have a fundamental right to engage in sexual intercourse with his consenting adult stepdaughter); *State v. Green*, 989 N.E.2d 1088, 1089–90 (Ohio Ct. App. 2013) (finding no fundamental right to engage in consensual sexual activity for hire); *Ex parte Morales*, 212 S.W.3d 483, 490–98 (Tex. Ct. App. 2006) (finding a statute that criminalized sexual conduct between a dormitory residential advisor and a student over the age of majority should be reviewed under a rational basis standard, which it met); *see also Flaskamp v. Dearborn Pub. Schs.*, 385 F.3d 935, 943 (6th Cir. 2004) (indicating that a ban on relationships between teachers and their students for one year after graduation would not be a direct and substantial burden on the right to intimate association and would be subject to a rational basis review). *But see Paschal v. State*, 388 S.W.3d 429, 434–37 (Ark. 2012) (finding a statute that criminalized sexual conduct between a teacher and an eighteen-year-old student infringed upon a fundamental right to privacy under the Arkansas Constitution).

In *State v. Hollenbeck*, the New Hampshire Supreme Court confronted a psychologist's constitutional challenge to a New Hampshire law that made it a crime for a therapist to have sexual relations with a

patient within one year of the termination of the therapeutic relationship in a manner which is not professionally recognized as ethical. 53 A.3d 591, 593 (N.H. 2012). The court found that "the kind of sexual relationship alleged here is not included in the constitutional right *Lawrence* recognized." *Id.* at 598. Rather, the relationship between a therapist and a former client is the kind of relationship " 'where consent might not easily be refused.' " *Id.* (quoting *Lawrence*, 539 U.S. at 578, 123 S. Ct. at 2484, 156 L. Ed. 2d at 525). Accordingly, the court applied a rational basis standard of review and upheld the statute as serving "legitimate governmental interests in protecting those who are vulnerable to exploitation from being exploited . . . and in maintaining the integrity of the mental health profession." *Id.* at 598–99.

We find *Hollenbeck* persuasive here. The statute as applied to this case does not invade a fundamental right. There is no fundamental right to engage in sexual relations in circumstances where one partner is in a position of power or authority over another. There was ample evidence that Edouard occupied a position of power and authority over each of his four victims. We would leave open the question whether a substantive due process challenge to Iowa Code section 709.15 could be successfully brought in other factual contexts. We also emphasize, as we stated earlier, that Edouard has not raised a vagueness or overbreadth challenge to section 709.15 in this case.

Edouard's other argument is that section 709.15, as applied to members of the clergy, violates the Establishment Clause of the United States and Iowa Constitutions. *See* U.S. Const. amend. I; Iowa Const. art. I, § 3; *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404, 406 (Iowa 2003) (noting that "ordinarily the courts have no jurisdiction over, and no concern with, purely ecclesiastical questions

and controversies," but "do have jurisdiction as to civil, contract, and property rights which are involved in or arise from a church controversy" (internal quotation marks omitted)).

In *State v. Bussmann*, the Minnesota Supreme Court divided equally on the question whether Minnesota's clergy sexual conduct statute—which applies only to members of the clergy—facially violated the Establishment Clause of the United States and Minnesota Constitutions. *See generally* 741 N.W.2d 79 (Minn. 2007).[6] A majority of the court found an Establishment Clause violation as applied to the facts of the defendant's trial because "[t]he state relied heavily on religious expert testimony to prove its case and the court allowed the jury to hear discussion that intertwined religious doctrine with state law." *Id.* at 92. The court elaborated, "Virtually all of this testimony lacked foundation to connect it to any secular standard, was irrelevant to any secular standard, was inadmissible hearsay evidence, and was highly prejudicial." *Id.* at 93. The court concluded:

> [T]he district court allowed the state to introduce extensive evidence regarding the Catholic Church's doctrine on the religious power of priests over parishioners; the Church's official policy on counseling and pastoral care; the Church's concerns about priest sexual misconduct; and the Church's official investigation and findings regarding Bussmann's behavior. Through the admission of this evidence, the court allowed the religious doctrine of the Catholic Church to become entangled with the criteria set out in the clergy sexual conduct statute for determining the criminality of Bussmann's conduct. The jury's verdict was based on this evidence, and was unavoidably entangled with the religious doctrine introduced into evidence by the state.

---

[6]Minnesota's statute makes it a crime for anyone who "is or purports to be a member of the clergy" to have sexual intercourse with another person "during a period of time in which the complainant was meeting on an ongoing basis with the actor to seek or receive religious or spiritual advice, aid, or comfort in private." Minn. Stat. § 609.344 subd. 1(*l*)(ii) (West, Westlaw current through 2014 Reg. Sess.).

*Id.* at 94.

Subsequently, in *State v. Wenthe*, the Minnesota Supreme Court held that Minnesota's clergy sexual conduct statute did not facially violate the Establishment Clause, because it was "part of a larger statutory scheme that regulates the behavior of those involved in . . . relationships for which the Legislature has determined there is a power imbalance between the parties" and "applies neutral principles of law and regulates only secular aspects of clergy–parishioner relationships." 839 N.W.2d 83, 88–91 (Minn. 2013).

The court also upheld the constitutionality statute *as applied* to the facts of the case because "the State did not attempt to shift the jury's focus away from the secular elements in the clergy-sexual-conduct statute and onto religious doctrine." *Id.* at 92. In *Wenthe*, unlike *Bussmann*, there was no testimony by a Catholic priest and a Catholic counselor about the religious power of priests, only a minimal amount of evidence admitted by the state related to the policies of the Catholic Church on pastoral care, and the state's evidence about the church's response to the sexual relationship was factually relevant to the case. *Wenthe*, 839 N.W.2d at 93–95.

We do not find section 709.15 violates the Establishment Clause as applied to clergy. As the State points out, the statute, unlike Minnesota's, is essentially neutral. It applies to all persons who provide or purport to provide mental health services. Iowa Code § 709.15(1)(*a*). Edouard notes the State's emphasis during trial on the victims' faith and on Edouard's status as the victims' pastor. But these were relevant evidentiary considerations because they showed why the victims would allow Edouard to have sex with them even as they were receiving mental health services from him. Edouard also overlooks the fact the case, as

tried, included three counts of sexual abuse. Evidence regarding Edouard's status and the victims' faith was particularly relevant to the sexual abuse counts, because it tended to explain why three of the four victims would later be *willing* to have sex with a person who had initially *forced* them to have sex with him.[7] Edouard, of course, does not contend that Iowa's sexual abuse statute violates the Establishment Clause. *See* Iowa Code § 709.1.

As in *Wenthe*, while the trial certainly did not veer away from the religious setting in which the defendant's conduct took place, it did not dwell on religious doctrine either. The defendant, not the State, sought to introduce evidence on standards of pastoral care. In addition to the victims themselves, the only witnesses called by the State were a psychologist as a rebuttal witness and two church elders. The elders testified primarily as fact witnesses to admissions and statements made in meetings after Edouard's conduct began to come to light. In the course of cross-examining the first elder, *Edouard's counsel* delved to some extent into the Covenant Reformed Church's mission. By doing so, Edouard's counsel was able to get this elder to admit, helpfully, that Edouard was expected to provide spiritual guidance—but not mental health services—to parishioners.

Notably, when the second elder was asked about his concerns regarding his congregation and its members, and Edouard objected on the basis of relevance, the district court sustained the objection. The court explained:

> Counsel, it seems to me that the discussions which took place between Mr. Edouard and members of the church

---

[7]Edouard's counsel attacked the sexual abuse charges during closing argument on this very ground.

are certainly relevant to the extent that they are his statements, but I'm concerned that the actions of the church and the positions of the church really don't have a bearing on the legal issues that are before the court.

Whether the church in its hierarchy and its functioning made a determination that Pastor Edouard had sinned, that he should be removed in some manner from his duties with the church, or that the church should in some manner sanction him, I have trouble believing that that is relevant to the issues in this case for this jury; and that the inclination would be for the jury to in some manner, essentially, be assisted by the findings of the church, which would be inappropriate in this case.

This incident illustrates the district court's sensitivity to the potential crossover between church canons and secular laws. It demonstrates the court enforced proper boundaries. While we would not foreclose an as-applied challenge in a future case, we are not persuaded by Edouard's Establishment Clause arguments here.

**F. Other Evidentiary Rulings**. Before trial, the State filed a motion in limine seeking to exclude any reference to evidence that Edouard's home in Pella was vandalized or that his family had been harassed after his sexual encounters with his parishioners came to light. This included evidence of a brick being thrown through his window and that his home and personal belongings were posted for sale on Craigslist, along with other evidence of harassment and vandalism.

In response to the motion, Edouard argued the evidence was relevant to explain why he left the Pella community after his conduct came to light. The court concluded:

In a general sense, the court believes that the evidence regarding allegations of a brick being thrown through a window, postings on Craigslist regarding the defendant's property, or reports of vandalism or harassment at the defendant's home in 2010 and 2011 is not relevant, at least of any apparent nature at this point.

It appears to the court that such evidence, if admitted, would merely confuse the jury, would distract the jurors

from the issues in the case which they must decide, and that it has little, if any, probative value in this case. If, in fact, it becomes apparent that there is a basis for admitting the evidence, the court certainly is willing to take another look at that, if raised by the defendant prior to the admission of the evidence.

The defendant presented his evidence in an offer of proof at trial. Edouard testified that, before the four women actually went to the police, a rock was thrown through his sons' bedroom window while they were sleeping. Additionally, spikes were placed behind the wheels of his vehicles in his driveway, his home and personal belongings were listed for sale on Craigslist along with his home telephone number, pizzas he had not ordered were delivered to his home, and the husband of one of the victims followed him "on a couple of occasions."

The questioning in the offer of proof ended as follows:

Q. Did all of these acts influence your decision to move to Michigan when you did? A. Yes. Absolutely.

Q. Why? A. Well, evidently we were not safe there. But also, it became clear to me that my presence probably was a lightning rod. I didn't want my children to be subjected to that kind of harassment. I wanted for there to be healing as soon as possible, and I thought my absence would be the first building block toward that.

Edouard maintains this information is relevant as the "threats and fear explain Edouard's hesitancy in answering questions about the allegations to the church elders, his general withdrawal from his friendships within the church, and his abrupt move out of Iowa." The State, however, argues the jury did not need this explanation.

We agree with the State. Edouard had admittedly engaged in sexual relations with four married women from his congregation. As he explained to the jury, "[T]he sins for which I resigned warranted my deposition as a minister." He testified that he was "censured" and "did not contest it." All this was scandalous enough for the jury to

understand why he left town. A jury would not conclude that Edouard believed he was guilty of a *crime* just because he moved to Michigan. We see no abuse of discretion.

Edouard also attempted to offer evidence that one of the victims, V.B., had an extramarital affair with another man, R.M., after having sexual relations with Edouard and before making any allegations against Edouard. Edouard indicated that V.B. told him about the details of this sexual relationship with R.M. and asked him to lie about it to her husband. Edouard argued the information was relevant for three reasons: (1) the fact she shared this type of information with Edouard about the second affair shows their relationship was one of friendship, not counseling; (2) the nature of the relationship V.B. had with R.M. was very similar to the relationship she had with Edouard, and she later lied to her husband about R.M. so it "is exactly the same kind of lie we believe she would be telling about Mr. Edouard"; and (3) the fact she gave $2000 to R.M. undermines the suggestion that the monetary gifts she gave to Edouard were as a result of any type of power relationship between the two.

The court determined the evidence of the affair was "squarely within the provisions of the rape shield law." It concluded evidence of the affair or money gift amounted to an argument that V.B. had "the same type of relationship the defendant claims" and "would be no different than a defendant claiming that the alleged victim had engaged in consensual sex with 15 other individuals and that that should be admitted as proof that the relationship with the defendant was consensual, which is precisely what is precluded by the rule."

Iowa Rule of Evidence 5.412(*a*) states, "[I]n a criminal case in which a person is accused of sexual abuse, reputation or opinion

evidence of the past sexual behavior of an alleged victim of such sexual abuse is not admissible." The purpose of this rule "is to protect the victim's privacy, encourage the reporting and prosecution of sex offenses, and prevent the parties from delving into distractive, irrelevant matters." *State v. Alberts*, 722 N.W.2d 402, 409 (Iowa 2006). However, "evidence of a victim's past sexual behavior other than reputation or opinion evidence" is admissible if it is "constitutionally required to be admitted." Iowa R. Evid. 5.412(*b*)(1). Additionally, the rule contains a balancing test, identical to that contained in rule 5.403, for the admission of evidence under 5.412(*b*). *Id.* r. 5.412(*c*)(3) ("If the court determines on the basis of the hearing described in rule 5.412(*c*)(2) that the evidence which the accused seeks to offer is relevant and the probative value of such evidence outweighs the danger of unfair prejudice, such evidence shall be admissible in the trial to the extent an order made by the court specifies evidence which may be offered and areas with respect to which the alleged victim may be examined or cross-examined.").

We have held that even if evidence of specific instances of sexual conduct is relevant, the defendant has no constitutional right to introduce that evidence when its probative value is outweighed by its prejudicial effect. *See State v. Mitchell*, 568 N.W.2d 493, 498–99 (Iowa 1997) (refusing to allow evidence of a victim's sexually transmitted diseases which the defendant did not contract because "the probative value of the evidence was substantially outweighed by the danger of unfair prejudice" and stating, "relevant evidence is not constitutionally required to be admitted if the prejudicial effect of the evidence outweighs the probative value"); *State v. Jones*, 490 N.W.2d 787, 791 (Iowa 1992) (noting there is no constitutional requirement to admit evidence of

victim's past sexual history where it is "more prejudicial than probative for the purposes urged").

In this case, it is highly questionable whether the evidence was even relevant. The argument that the disclosure of private information about an individual's sexual liaisons with others is indicative of a friendship rather than a counseling relationship does not seem logical. It is certainly not unheard of for an individual to discuss an extramarital affair with a counselor or to request one's counselor to keep that information secret.

Additionally, the fact that V.B. lied to her husband about an affair with another man would add little, if anything, of value to Edouard's defense. V.B. admittedly lied to her husband about the money she gave Edouard, and of course she kept the entire sexual relationship with Edouard secret from her husband.

Finally, V.B.'s willingness to give a far more modest ($2000 as opposed to $70,000) financial gift to another person with whom she had a later affair would not make it much less likely that her relationship with Edouard was an uneven one in which he acted as her counselor.

The district court in this case correctly concluded the evidence of V.B.'s alleged affair fell within the protection of the rape shield law, rule 5.412. The court noted the testimony had a clear prejudicial effect: It would tend to suggest that because V.B. had a consensual affair with another individual, she therefore had a consensual affair with Edouard. We find no error in the district court's ruling.

**G. Restitution.** Finally, Edouard claims the district court erred with respect to the restitution it awarded against him. Each of the women and two of their spouses received payments from the crime

victim compensation program (CVCP). *See* Iowa Code § 915.86.[8] The State sought to charge those payments against Edouard. *See id.* § 910.2(1). At the restitution hearing, the State called to the stand the restitution subrogation coordinator from the crime victim assistance division. The State also presented six exhibits—the crime victim assistance division's files for all four victims and two of the victims' husbands. Following this hearing, the court ordered that the State's CVCP could recoup a total of $12,956.74 in restitution from Edouard.

In *State v. Jenkins*, we held that amounts paid to victims by the CVCP may not be automatically charged back to the defendant. 788 N.W.2d 640, 645–47 (Iowa 2010). Rather, there may be a review by the district court to determine whether the statutory causation requirements of Iowa Code section 915.86 have been met. *Id.* at 647. The district court conducted such a review here but Edouard challenges its sufficiency.

Specifically, Edouard claims the State's witness had no firsthand knowledge that the treatment received by the victims could be linked to his criminal conduct. He maintains a causal connection cannot be shown simply by calling a witness who brings in paperwork completed by others.

The State's witness testified to the manner in which requests for compensation are approved by the crime victim assistance division:

> In every claim that is filed with our office, the victim signs a release of information, and they put on the release who the providers are that they want assistance with for payment. And also on the application there is a place to

---

[8]Under certain circumstances, spouses can be eligible to receive victim compensation as "secondary victims," such as for mental health care and transportation. *See* Iowa Code §§ 915.80(5), .86(12), (15).

> mark what benefits they're seeking. So based on that information, we send out . . . request forms to those providers and they complete them. And we also ask for itemized statements and the medical records, and then the compensation specialist reviews that and determines whether or not it is crime related.
>
> And . . . then we have a quality control system also that reviews that file to make sure that everything was done right.

She further testified that each mental health or medical provider also fills out a verification form regarding the treatments that indicates whether the service was related to the crime.

In this case, the providers in question had attested in writing that all the treatments were related to the crime. Each exhibit contained a form signed by the treatment provider that verified the treatments in question were "provided as a direct result of the crime." The coordinator also confirmed this in her testimony. Edouard did not attempt to present any evidence of his own but did vigorously cross-examine the coordinator.

We do not believe restitution proceedings are subject to strict rules of evidence. *See* Iowa R. Evid. 5.1101(*c*)(4) (stating the rules of evidence do not apply in sentencing proceedings). In the review of a restitution order, " 'we determine whether the court's findings lack substantial evidentiary support, or whether the court has not properly applied the law.' " *Hagen*, 840 N.W.2d at 144 (quoting *State v. Bonstetter*, 637 N.W.2d 161, 165 (Iowa 2001)). As the district court explained,

> [t]he court has reviewed the mental health services provided to the victims, and to the secondary victims, to the extent the notes and records are available, and finds that the State has established the propriety of assessing those mental health costs as part of the restitution herein.

We uphold as supported by substantial evidence the district court's conclusion that the mental health care costs charged to Edouard were

incurred "as a direct result" of Edouard's crimes. *See* Iowa Code § 915.86(1); *see also id.* § 910.2(1) (requiring sentencing courts to order offenders to make restitution "to the victims of the offender's criminal activities").

Next, Edouard contests the travel expenses granted for attendance at trial.[9] Edouard maintains these were costs of prosecution that should not have been charged against him. However, Iowa Code section 915.86(15) makes clear that victims can be compensated for "[r]easonable expenses incurred by the victim [or] secondary victim," including "for transportation to medical, counseling, . . . or criminal justice proceedings, not to exceed one thousand dollars per person." The district court's award was therefore proper.

Edouard's reliance on *State v. Knudsen* is misplaced. *See* 746 N.W.2d 608, 610 (Iowa Ct. App. 2008). True, the court of appeals there noted that prosecution costs generally cannot be included in a restitution order. *See id.* But the difference here is the State is seeking reimbursement for crime victim assistance as opposed to direct restitution. *See* Iowa Code § 910.2(1). The crime victim assistance statute specifically authorizes compensation to victims for transportation expenses under the circumstances presented here. *See id.* § 915.86(15). The State produced evidence to support the victims' claims of trial attendance.

Edouard's third argument is that the victims were not eligible for compensation under Iowa Code section 915.87(2)(*a*) because they consented to their relationships with Edouard. That subsection

---

[9]As noted above, the trial location was changed from Marion County, where the victims resided, to Dallas County.

provides that victim compensation "shall not be made when the bodily injury or death for which a benefit is sought was caused by . . . [c]onsent, provocation, or incitement by the victim." *Id.* § 915.87(2)(*a*). The trial court correctly found this provision did not apply. It would miss the entire point of the counselor–therapist sexual exploitation law to hold that these victims' mental health injuries were caused by their "consent," as opposed to the conduct of the defendant, which we have described in detail above.

Finally, Edouard urges that the trial court erroneously overruled an objection that the victims had failed to comply with certain limitations and reporting requirements contained in Iowa Code sections 915.84(1) and (2). The first subsection requires a victim seeking compensation to apply within two years after "the date of the crime" or "the discovery of the crime," and the second subsection indicates an individual is not eligible for compensation "unless the crime was reported to the local police department or county sheriff department within seventy-two hours of its occurrence" or "within seventy-two hours of the time a report can reasonably be made" if it cannot be reasonably reported within seventy-two hours of its occurrence. *Id.* § 915.84(1)–(2). However, both subsections also indicate the department of justice may waive the time limitation and reporting requirements "if good cause is shown." *Id.*

Edouard points out that some of the victims used the date of their police reports, January 2011, as the crime date, despite the fact that much of the sexual abuse and exploitation occurred years before. He argues the crimes were not reported within seventy-two hours of their commission and reimbursement was not sought within two years of the crime. Therefore, unless good cause was shown, the victims and

secondary victims (i.e., the spouses) were not eligible for compensation under the statute.

The State argues, in effect, that Edouard has no standing to raise a claim of untimeliness because "the decision is between the agency and the applicant" whether to award compensation from the CVCP. We disagree. We think the rationale of *Jenkins* holds otherwise. Regardless of whether the State has paid some amount to a victim of crime, in order to recover that same amount from the defendant as restitution it must show it complied with the underlying law. Otherwise stated, defendants should be able "to challenge erroneous CVCP payments." *Jenkins*, 788 N.W.2d at 645.

The State's witness did testify that a timeliness review is regularly performed and that a memo is usually prepared if an extension of time is approved. However, the memo is "considered confidential." The witness did not know if a memo existed in this case.

We believe this evidence is insufficient to establish the department for justice actually found good cause. Indeed, if it were deemed sufficient, no defendant would ever be able to raise a timeliness challenge. Admittedly, we have not previously held that *Jenkins* permits a defendant to object to a CVCP restitution award on the ground that the deadlines were not waived for good cause. Therefore, we believe the appropriate course of action is to reverse and remand to give the State the opportunity to introduce evidence that the CVCP waived any deadlines in sections 915.84(1) or (2) for good cause shown.

## IV. Conclusion.

For the foregoing reasons, we conditionally affirm Edouard's conviction and sentence under Iowa Code section 709.15(4)(*a*) and his conviction and sentence under section 709.15(4)(*c*) with respect to W.B.

We affirm Edouard's remaining convictions. We reverse the restitution award to the State. We remand for further proceedings consistent with this opinion.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Appel, J., and Cady, C.J., who concur specially, and Hecht and Wiggins, JJ., who concur in part and dissent in part.

**APPEL, Justice (concurring specially).**

**Part I.**

I agree with Justice Mansfield's opinion regarding the proper interpretation of Iowa's sexual exploitation statute. I do not join, however, the discussion of the state constitutional issues presented in this case. Instead, I present a different analysis, which today, as it has in many recent cases, commands the support of the majority of the court.

**Part II.**

Where a party raises issues under the Iowa Constitution and the Federal Constitution, but does not suggest a different standard be applied under the Iowa Constitution, we generally apply the federal standard. This comes, however, with an important and indeed critical caveat, namely, that we reserve the right to apply that standard differently than its federal counterpart. *See, e.g., Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 93 (Iowa 2014) ("[W]here a party does not suggest a different standard under Iowa law, we adopt for the purposes of the case the federal standard, reserving the right to apply the standard differently than under the federal cases."); *State v. Ragland*, 836 N.W.2d 107, 113 (Iowa 2013) (noting "we . . . reserve the right to apply the [federal standard] in a more stringent fashion than federal precedent"); *State v. Kern*, 831 N.W.2d 149, 172, 174 (Iowa 2013) (applying federal standards but explicitly reserving the right to apply those standards "in a more stringent fashion than federal precedents"); *State v. Tyler*, 830 N.W.2d 288, 291–92 (Iowa 2013) ("Where a party raises both state and federal constitutional claims but does not argue that a standard independent of the federal approach should be employed

under the state constitution, we ordinarily apply the substantive federal standards but reserve the right to apply the standard in a fashion different from federal precedent."); *State v. Becker*, 818 N.W.2d 135, 150 (Iowa 2012) ("Even where a party has not provided a substantive standard independent of federal law, we reserve the right to apply the standard presented by the party in a fashion different than the federal cases."); *NextEra Energy Res., LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 45 (Iowa 2012) ("Even in cases where a party has not suggested that our approach under the Iowa Constitution should be different from that under the Federal Constitution, we reserve the right to apply the standard in a fashion at variance with federal cases under the Iowa Constitution."); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012) ("[W]e do not necessarily apply the federal standards in the same way as the United States Supreme Court."); *State v. Breuer*, 808 N.W.2d 195, 200 (Iowa 2012) ("[E]ven when the parties advance no substantive distinction, we may apply the principles differently."); *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011) ("Even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law."); *State v. Fannon*, 799 N.W.2d 515, 519 n.1 (Iowa 2011) ("[A]lthough we reserve the right to apply the principles differently, we generally assume that the legal principles governing both provisions are the same."); *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011) ("Even in . . . cases in which no substantive distinction ha[s] been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution . . . ."); *Simmons v. State Pub. Defender*, 791 N.W.2d 69, 76 n.3 (Iowa 2010) ("Even in cases where no substantive distinction has been advanced by the parties [between Iowa and federal

constitutional law], we reserve the right to apply the principles differently."); *State v. Bruegger,* 773 N.W.2d 862, 883 (Iowa 2009) ("[W]e do not necessarily apply the federal standards in the same way as the United States Supreme Court."); *Varnum v. Brien,* 763 N.W.2d 862, 878 n.6 (Iowa 2009) ("[W]e have jealously guarded our right to employ a different analytical framework under the state equal protection clause as well as to independently apply the federally formulated principles." (Internal quotation marks omitted.)); *In re S.A.J.B.,* 679 N.W.2d 645, 648 (Iowa 2004) ("In analyzing claims under the Iowa Equal Protection Clause, we independently apply federal principles."); *Racing Ass'n of Cent. Iowa v. Fitzgerald,* 675 N.W.2d 1, 6–7 (Iowa 2004) ("[T]his court's independent application of the rational basis test might result in a dissimilar outcome from that reached by the Supreme Court in considering the federal constitutional claim."). Of course, this established principle does not necessarily mean that we will depart from federal applications, as our independent judgment may lead us to agree with the federal caselaw. *See Breuer,* 808 N.W.2d at 200–01 (recognizing authority to depart in application of federal caselaw but declining to do so). As noted by Robert F. Williams, a leading expert on state constitutional law, "State courts might even agree with the United States Supreme Court on the *meaning*—both textually and historically—of identical or similar federal and state constitutional provisions, but proceed to *apply* them differently under particular circumstances." Robert F. Williams, *State Courts Adopting Federal Constitutional Doctrine: Case-By-Case Adoptionism or Prospective Lockstepping?*, 46 Wm. & Mary L. Rev. 1499, 1501 (2005).

The distinction between a standard and its application is especially important where the legal principles have high degrees of generality,

such as "totality of circumstances" tests, tests based upon "gross proportionality," and tests based upon "reasonableness." *See* Robert F. Williams, *The Law of American State Constitutions* 169–71 (2009); *cf.* Jeffrey S. Sutton, *What Does—and Does Not—Ail State Constitutional Law,* 59 U. Kan. L. Rev. 687, 707 (2011) [hereinafter Sutton].[10] Even accepting the generalized standard, there is often no single correct answer to the interpretation of generalized constitutional commands, but only a range of plausible answers which must be decided on a case-by-case basis with the exercise of independent judgment. *See Chicago & N.W. Ry. v. Fachman*, 255 Iowa 989, 996, 125 N.W.2d 210, 214 (1963) (noting in the context of state and federal equal protection claims that "[w]hile the general rules applicable in such cases seem pretty well settled, as is so often the case the difficulty arises in their application"). A majority of the court today reaffirms the principle articulated in our many cases, namely, that where a party raises both state and federal constitutional claims, we generally apply the federal standard but reserve the right to apply the standard in a fashion different and more stringent from federal caselaw. To the extent there is any implication by silence in

---

[10]As noted by Judge Sutton:

> Why the meaning of a federal guarantee proves the meaning of an independent state guarantee is rarely explained and often seems inexplicable. If the court decisions of another sovereign ought to bear on the inquiry, those of a sister state should have more to say about the point. State constitutions are more likely to share historical and cultural similarities. They necessarily will cover smaller jurisdictions. And in almost all instances they will be construing individual-liberty guarantees that originated in state constitutions, not the Federal Constitution . . . .

Sutton, 59 U. of Kan. L. Rev. at 708. *See generally State v. Baldon*, 829 N.W.2d 785, 803–35 (Iowa 2013) (Appel, J., concurring specially) (discussing the historic role of state constitutions in the protection of individual rights and the status of independent state constitutional law after the incorporation of the Bill of Rights).   .

our cases that do not explicitly cite this well-established principle, we reject it.

Turning to the merits of the constitutional claims presented in this case, we conclude Edouard has not advanced a separate standard for analysis under the Iowa Constitution, and therefore apply the general standard in the federal caselaw. Based on the available cases applying the generally applicable standards, we narrowly conclude, as does Justice Mansfield, that, as applied under the facts and circumstances of this case, the sexual exploitation statute does not invade a fundamental right under the United States Constitution. *See State v. Hollenbeck*, 53 A.3d 591, 597–98 (N.H. 2012) (concluding constitutional right recognized in *Lawrence v. Texas*, 539 U.S. 558, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) does not extend to imbalanced relationships that are not fully consensual). We similarly conclude that Edouard has not shown the statute as applied to him violates the Establishment Clause under the United States Constitution, largely for the reasons discussed in Justice Mansfield's opinion. *Cf. State v. Wenthe*, 839 N.W.2d 83, 88–91 (Minn. 2013) ("But the inclusion of religious actors [in the Minnesota clergy-sexual-conduct statute] does not violate the Establishment Clause because the limitation on members of the clergy is part of a larger statutory scheme that regulates the behavior of those involved in certain sexual relationships—relationships for which the Legislature has determined there is a power imbalance between the parties."). We then proceed to the next step in the analysis and decline to apply the substantive standards advanced by Edouard in a fashion different from the prevailing caselaw under the Iowa Constitution. We decline to apply the legal standards on these issues differently than in *Hollenbeck* and *Wenthe* under the Iowa Constitution because we are persuaded that the

legal standards accepted by those parties have been sensibly applied in those cases. As a result, we reject the specific constitutional claims raised by Edouard in this case under both the United States and Iowa Constitutions.

Cady, C.J., joins this special concurrence; Wiggins and Hecht, JJ., join in Part II only.

**HECHT, Justice (concurring in part and dissenting in part).**

I concur in that part of the majority's opinion reversing the district court's ruling denying Patrick Edouard's request for in camera review of W.B.'s counseling records. I respectfully dissent from the remainder of the majority's opinion because I believe Edouard was prejudiced by the district court's failure to properly instruct the jury and its abuse of discretion in excluding expert testimony that would have been helpful to the jury and essential to the defense. I would therefore reverse the convictions and remand for a new trial.

Edouard served as the pastor of the Covenant Reformed Church in Pella, Iowa, from 2003 to 2010. At various times during that seven-year period, Edouard engaged in sexual relationships with four female members of his congregation. Details of the relationships first emerged in December 2010, and in the next few weeks, Edouard and each of the four women had confessed the relationships to their church elders.

In January 2011, the women attended group therapy sessions in which they discussed with each other their relationships with Edouard. After attending the therapy sessions, the women filed a report with the Pella police department, alleging each "was the subject of [Edouard's] counseling and pastoral care." Edouard was later charged with four counts of sexual exploitation by a counselor or therapist, in violation of Iowa Code section 709.15(2)(*c*); one count of a pattern, practice, or scheme to engage in sexual exploitation by a counselor or therapist, in violation of Iowa Code section 709.15(2)(*a*); and three counts of third degree sexual abuse, in violation of Iowa Code section 709.4(1).

Before trial, the State moved to limit the expert testimony of Dr. Hollida Wakefield, an expert offered by Edouard to explain several

features of the relationships to the jury and to aid him in presenting his defense that he had not been providing mental health services, for purposes of the statute, in any of the four relationships. More specifically, the State sought to exclude any testimony about differences between pastoral care and pastoral counseling and any testimony indicating Edouard may have been engaged in the former, but not the latter, with each of the women. That testimony, the State argued, would be unhelpful and misleading to the jury and would constitute an improper legal conclusion. The district court granted the motion, concluding Wakefield's definitions would be of no assistance in explaining the statutory meanings of mental health services or counseling to the jury and would improperly invade the "function of the jury."

At trial, Edouard contended he had not, in any of the four relationships, acted as a "counselor or therapist" providing "mental health services" under the meaning of section 709.15. He moved for judgment of acquittal at the conclusion of the prosecution's case, and later renewed the motion at the conclusion of the trial, contending the State had failed to present sufficient evidence of sexual exploitation under the requirements of the statute. The district court denied these motions.

Upon conclusion of the ten-day trial, Edouard submitted to the court a proposed marshaling instruction for the jury. His proposed instruction enumerated the specific professions set forth in the definition of "counselor or therapist" in section 709.15(1)(*a*), with additional language clarifying that the definition required a "formal counseling relationship." Edouard also requested an instruction indicating a conviction under section 709.15 required proof that one or more of the

women had been his "patient or client." Finally, he requested an instruction defining "mental health services" and incorporating definitions we have used in previous cases for the statutory terms "treatment," "assessment," and "counseling." The district court denied these requests and gave its own less detailed instructions over Edouard's objection.

After deliberation, the jury found Edouard guilty of each of the four counts of sexual exploitation by a counselor or therapist and guilty of the pattern or practice count. He was acquitted of the three counts of sexual abuse.

Edouard appealed the convictions, and we transferred the case to the court of appeals. Along with challenges to the district court's rulings on his expert evidence and his proposed marshaling instructions, Edouard raised additional evidentiary challenges and a constitutional challenge to the application of section 709.15 to his conduct and to other members of the clergy engaging in similar conduct. The court of appeals concluded the trial court had abused its discretion in declining to give Edouard's proposed instruction on "mental health services," found Edouard had suffered prejudice as a result of the error, and reversed the convictions. Although unnecessary to its resolution of the case, the court of appeals also noted the district court had erred in excluding the portions of Dr. Wakefield's testimony regarding pastoral care and pastoral counseling. Having resolved the case on the instructional ground and given guidance regarding the expert testimony, the court of appeals declined to reach Edouard's other challenges. I believe the court of appeals correctly decided these issues, and I would affirm its opinion for the reasons explained below.

Section 709.15 prohibits a "counselor or therapist" from engaging in a number of enumerated forms of sexual conduct with an "emotionally dependent patient or client" who receives "mental health services" from the counselor or therapist. *See* Iowa Code § 709.15(2)(*c*) (2013). The section defines "counselor or therapist" as

> a physician, psychologist, nurse, professional counselor, social worker, marriage or family therapist, alcohol or drug counselor, member of the clergy, or any other person, whether or not licensed or registered by the state, who provides or purports to provide mental health services.

*Id.* § 709.15(1)(*a*). "Mental health service" is defined as "the treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction." *Id.* § 709.15(1)(*d*). A "patient or client" is "a person who receives mental health services from the counselor or therapist." *Id.* § 709.15(1)(*e*). The provision also provides a meaning for "emotionally dependent," defining it as "the nature of the patient's . . . emotional condition or the nature of the treatment provided . . . is such that the counselor or therapist knows or has reason to know that the patient . . . is significantly impaired in the ability to withhold consent." *Id.* § 709.15(1)(*b*).

In examining the application of section 709.15 to specific relationships in the past, we have explained we must assess not just isolated words and phrases in the statute, but the section in its entirety, and we must look for an interpretation best achieving the statute's purpose. *State v. Gonzalez*, 718 N.W.2d 304, 308 (Iowa 2006). In discerning the meaning of the phrase "mental health services," we have noted it cannot "encompass strictly personal relationships involving the informal exchange of advice." *State v. Allen*, 565 N.W.2d 333, 337 (Iowa

1997).  Instead, when we have analyzed the meaning and purpose of section 709.15 in the past, we have emphasized the specialized, technical meaning of mental health services and its close association with forms of therapy provided by professionals.  *Id.*; *Gonzalez*, 718 N.W.2d at 308–09.

In *Allen,* for example, we encountered a case of a woman who suffered severe emotional problems in connection with significant marital strain and due, at least in part, to physical and mental abuse she had suffered as a child.  *Allen*, 565 N.W.2d at 335.  She had been hospitalized frequently in the course of dealing with these problems and had several times attempted suicide.  *Id.*  After a particularly challenging pregnancy and pregnancy-related surgery, she began to experience physical symptoms, which went unabated despite medical and psychiatric treatment.  *Id.*  Eventually, she sought the assistance of an unlicensed hypnotherapist.  *Id.*  In several lengthy meetings over the course of four months, the hypnotherapist supplied her with alcoholic beverages and initiated and escalated intimate physical contact with her, assuring her "that such physical contact would help her to recover from the effects of the sexual abuse she had endured as a child."  *Id.*

The hypnotherapist was eventually charged with and convicted of sexual exploitation under section 709.15.  *Id.* at 336.  On appeal, the hypnotherapist did not deny that he was a counselor or therapist for purposes of the statute, and likewise, did not dispute that he had provided, or at least purported to provide, mental health services.  *Id.* Instead, he contended section 709.15 was unconstitutionally vague.  *Id.* Analyzing section 709.15 for purposes of that contention, we explained we would not entertain the "challenge unless the statute reache[d]" a significant amount of protected conduct.  *Id.* at 337.  We concluded section 709.15 presented no such danger of substantial encroachment,

because it clearly did not reach "informal exchange of advice" or "ordinary conversations." *Id.* Moreover, we explained, the statute would not typically apply to "innocuous event[s]" in "romantic relationship[s]," and would rarely, "if ever, apply to a marriage relationship." *Id.* at 338. The relationship at issue in *Allen* was much different, we explained: the hypnotherapist had at all times been acting "[a]s a therapist," and in a "professional role[]." *Id.* at 337 n.2. Later in our analysis of the hypnotherapist's challenges to his convictions, we emphasized the victim had sought the hypnotherapist out for help with her physical symptoms associated with her long history of mental health problems, and that he had engaged in his problematic contact with her while she was "in his office for treatment" for these issues. *Id.* at 339. Given those indications of a professional treatment relationship, we affirmed the hypnotherapist's convictions. *Id.* at 340.

In *Gonzalez,* we had occasion to analyze the meaning of the phrase "mental health services" more directly and extensively, as the defendant challenged directly, in a pretrial motion to dismiss, the allegations that he had been working as a counselor or therapist and had been providing mental health services. *Gonzalez,* 718 N.W.2d at 307–08. The defendant in *Gonzalez* worked as a nursing assistant in the psychiatric unit of the University of Iowa Hospitals and Clinics, and had been charged with sexual exploitation as a result of invasive physical contact with a female patient. *Id.* at 306. The trial court granted the nursing assistant's motion to dismiss, determining the assistant had not, even accepting various allegations by the State as true, been providing mental health services within the meaning of section 709.15. *Id.* The State appealed. *Id.*

Analyzing on appeal the nursing assistant's contention he had not been providing mental health services, we parsed the phrase's component parts of "treatment," "assessment," and "counseling" "for certain dysfunctions." *Id.* at 308. We consulted a dictionary to illuminate the meanings of these terms and recognized each incorporated a specific, technical meaning, typically associated with professional diagnostic and therapeutic modalities, for purposes of the statute. *Id.* Armed with that understanding, we concluded the nursing assistant might reasonably be found to have provided treatment for purposes of section 709.15, given the allegations that he performed essential tasks in "providing care of psychiatric patients," he assisted in "providing for a therapeutic environment," and he participated "in planning patient care." *Id.* Similarly, we explained, he may have provided assessment "because he performed nursing tasks to assist in monitoring psychiatric patients," and had assisted with the documenting and reporting of patient behavior. *Id.* Most importantly, we emphasized, the nursing assistant might reasonably be found to have provided "treatment and assessment" to the patient because he had performed his tasks while she was admitted in the psychiatric unit for psychiatric care. *Id.* at 308–09. Given the existence of that professional treatment environment and relationship, we concluded, the nursing assistant's provision of certain services might reasonably have "qualifie[d] him as a 'counselor' or 'therapist' for purposes of Iowa Code section 709.15," and thus we reversed the district court's dismissal and remanded for trial. *Id.* at 310.

Emerging from these analyses is a clear picture of the meaning of section 709.15 and its counselor or therapist and mental health services requirements. The statute proscribes certain specified forms of conduct undertaken in the course of specialized, formal treatment relationships

and environments. *See id.* at 308–09 (emphasizing the victim's presence in the psychiatric unit, the "therapeutic relationship," and the "therapeutic environment"). The structure and language of section 709.15 and related provisions in the Iowa Code illuminate this understanding. The section's requirement that the conduct occur between the counselor or therapist and a "patient or client" of the counselor or therapist, for example, plainly implicates a professional relationship, indicating the statute reaches only those relationships rising to the level of a formal professional treatment relationship. *See, e.g.*, Iowa Code § 709.15(2)(*b*) (proscribing certain conduct with an "emotionally dependent patient or client" or an "emotionally dependent former patient or client").

The statutory definition of "emotionally dependent" is also instructive in my analysis, providing the emotional dependence required for an exploitation charge must arise from the nature of a patient's emotional condition or "the nature of the *treatment* provided by the counselor or therapist." *Id.* § 709.15(1)(*b*) (emphasis added). We noted in *Gonzalez* that a standard meaning of "treatment" is " 'the action or manner of treating a patient medically or surgically.' " *Gonzalez*, 718 N.W.2d at 308 (quoting *Webster's Third New International Dictionary* 2434–35 (unabr. ed. 2002)). The incorporation of this specialized concept in the statutory definition of emotionally dependent suggests section 709.15 reaches a specific class of formal therapeutic relationships—namely, those relationships where the services provided may be characterized as constituting formal professional treatment. *See* Iowa Code § 709.15(1)(*b*). The related civil damages provision, setting forth the statute of limitations for damages claims brought in connection with sexual exploitation charges, underscores that understanding, in

providing "action[s] . . . shall be brought within five years of the date the victim was *last treated* by the counselor or therapist."  *Id.* § 614.1(12) (emphasis added).

Section 709.15 very clearly bounds the categories of actors and types of relationships that may run afoul of the statute in setting forth its definition of "counselor or therapist."  Physicians, psychologists, nurses, professional counselors, social workers, marriage and family therapists, and alcohol and drug counselors, I recognize, fill specialized, technical roles in the realm of psychiatric care, and perform highly specialized functions in providing professional mental health services for clients and patients.  The definition of "counselor or therapist" itself emphasizes as much, incorporating the specialized elements of treatment, assessment, and counseling we parsed in *Gonzalez* in identifying these professionals as providers of mental health services.  *Id.* § 709.15(1)(*a*).  The longstanding inclusion of clergy in this class should not alter this understanding, as several sections of the Iowa Code and administrative rules indicate clergy, in certain contexts, may provide precisely these kinds of formal therapeutic mental health services.  *See, e.g.*, *id.* § 154D.4(1) (noting clergy may provide mental health counseling in accordance with standards in their profession); Iowa Admin. Code r. 481—53.15(1)(*a*) (noting spiritual counseling in hospice environment shall be provided in accordance with an "interdisciplinary plan of care").

Various provisions in the Iowa Code addressing similar subject matter highlight the specialized nature of the services these classes of professionals provide and the specific training they typically undergo. *See, e.g.*, Iowa Code § 135H.1(5) (setting forth coursework and clinical training requirements in defining "mental health professional" for purposes of chapter addressing psychiatric medical institutions); *id.*

§ 154D.4(1) (establishing that certain statutory licensing requirements do not prevent "nurses, psychologists, social workers, physicians . . . or members of the clergy, from providing or advertising that they provide services of a marital and family therapy or mental health counseling nature consistent with the *accepted standards* of their *respective professions*" (emphasis added); *see also id.* § 135G.1(6) (defining mental health services as "services provided by a mental health professional operating within the scope of the professional's practice which address mental, emotional, medical, or behavioral problems"); Ingeborg E. Haug, *Boundaries and the Use and Misuse of Power and Authority: Ethical Complexities for Clergy Psychotherapists*, 77 J. of Counseling & Dev. 411, 411 (1999) ("*Clergy psychotherapists* are defined as mental health professionals who have received dual education and training as clergy and as psychotherapists (the term clergy encompasses Christian and non-Christian religions)."). Similarly, numerous administrative rules indicate these classes of actors generally receive substantial training and typically fill specialized, technical roles in diagnosing and ameliorating specific mental health dysfunctions. *See, e.g.,* Iowa Admin. Code r. 441—88.61 (defining "mental health services" as "those clinical, rehabilitative, or supportive services provided by an individual, agency, or other entity that is licensed, accredited, certified, or otherwise approved as required by law to treat any mental disorder listed in the International Classification of Diseases"); *id.* r. 645—31.1 (defining "mental health setting," for purposes of licensure of marital and family therapists, as "a behavioral health setting where an applicant is providing mental health services including the diagnosis, treatment, and assessment of emotional and mental health disorders and issues"); *id.* r. 645—31.5 (marital and family therapists); *id.* r. 645—280.5 (social

workers); *id.* r. 653—9.3 (physicians); *id.* r. 655—6.1 (registered and practical nurses). The enumeration of these classes of professionals in section 709.15, the corresponding exclusion of other categories of actors, and the indications in section 709.15, other related sections of the Iowa Code, and the administrative rules, of the types of services these professionals provide highlight the formal therapeutic and diagnostic nature of the relationships contemplated by the statute.

A survey of related statutes and jurisprudence in sister jurisdictions augments my understanding that section 709.15 is calculated to criminalize conduct in formal treatment relationships in which therapeutic mental health services are provided, or in which the defendant has purported to provide such services. A few states have sexual exploitation statutes broader than ours, criminalizing conduct between various enumerated actors and certain vulnerable individuals, without requiring a formal professional therapeutic relationship. *See, e.g.*, Ark. Code Ann. § 5-14-126(a)(1)(C) (West, Westlaw through 2014 Fiscal Sess.) (mandated reporters and clergy members); Tex. Penal Code Ann. § 22.011(b)(10) (West, Westlaw through 2013 Third Called Sess.) (requiring, in case of clergyperson, merely a role "as spiritual adviser"). *See generally* Bradley J. B. Toben & Kris Helge, *Sexual Misconduct with Congregants or Parishioners: Crafting A Model Statute*, 1 Brit. J. Am. Legal Stud. 189, 209–10 (2012) [hereinafter Toben & Helge] ("Of [thirteen jurisdictions with sexual exploitation statutes], only two have language that is designed to criminalize such conduct by clergypersons outside of the counseling context."). Arkansas, for example, criminalizes conduct when a person is a "mandated reporter [of child maltreatment] or a member of the clergy and is in a position of trust or authority over the victim and uses the position of trust or authority to engage in [proscribed

conduct]." Ark. Code Ann. § 5-14-126(a)(1)(C). The Arkansas statute provides no further definition of "trust or authority," contains no mental health services requirement, contains no patient or client requirement, and enumerates a list of relevant actors far longer and more inclusive than the list enumerated in our own statute. *Compare id.* § 5-14-126(a), *with* Iowa Code § 709.15(1)(*a*); *see also* H.F. 682, 78th G.A., Reg. Sess. (Iowa 1999) (proposing an "exploitation by a person in authority" statute which would have applied, had it been adopted, to relationships with certain school-aged juveniles).

Other states, by contrast, have more narrowly drawn exploitation statutes, more closely resembling our own. *See, e.g.*, Conn. Gen. Stat. Ann. § 53a-65(9) (West, Westlaw through 2014 Feb. Reg. Sess.) (enumerating in its definition of "psychotherapist" traditional classes of mental health providers and adding hypnotists); N.D. Cent. Code Ann. § 12.1-20-06.1(2) (West, Westlaw through 2013 Reg. Sess.) (defining "therapist" to mean "a physician, psychologist, psychiatrist, social worker, nurse, chemical dependency counselor, member of the clergy, or other person, whether licensed or not by the state, who performs or purports to perform psychotherapy"); S.D. Codified Laws § 22-22-27(3) (West, Westlaw through 2014 Reg. Sess.) (defining "psychotherapist" to include various traditional classes of mental health professionals, and including clergymembers, marriage and family therapists, and other "mental health services provider[s]"); Utah Code Ann. § 76-5-406(12) (West, Westlaw through 2014 Gen. Sess.) (enumerating specific classes of professional providers and requiring act "committed under the guise of providing professional diagnosis"); Wis. Stat. Ann. § 940.22; *see also id.* § 455.01(6) (West, Westlaw through 2013 Wis. Act. 380) (defining "psychotherapy" to include specific methods and functions performed in

"professional relationship"). By enumerating certain professional classes of actors, including clergy, while defining mental health services or its analog, psychotherapy, in terms of the technical therapeutic function being performed, these statutes underscore the technical nature of the relationships they cover.

Of course, as the majority points out, the definition of "counselor or therapist" in section 709.15 does not require state licensure or registration, and makes reference to "any" individuals who provide or purport to provide mental health services. Those indications, however, should not alter the foregoing analysis. In both *Gonzalez* and *Allen*, we very clearly considered individuals operating in occupational classes not explicitly identified in the definition of "counselor or therapist," and yet we examined the nature of the relationship and the nature of the environment in each scenario to ensure the interaction rose to the level of a formal therapeutic relationship. *See Gonzalez*, 718 N.W.2d at 308; *Allen*, 565 N.W.2d at 337. As explained, section 709.15 limits its coverage in using and defining the term "counselor or therapist"—the statute very clearly does *not* use or define the term "any person," or "any person who provides mental health services," or "any person in a position of power or authority." Moreover, the definition of counselor or therapist has not been set forth so generally as to cover merely "any person who provides mental health services," as our general assembly has clearly identified instructive classes of actors before including the less specific "any other person" language. As we have explained on numerous occasions, the "any other person" language must be read in the context of the language surrounding it. *See, e.g., Sorg v. Iowa Dep't of Revenue*, 269 N.W.2d 129, 132 (Iowa 1978) ("Under the applicable rule of Noscitur a sociis, the meaning of a word in a statute is ascertained in light of the

meaning of words with which it is associated."). In this case, the language preceding "any other person" indicates specific classes of actors who engage in professional therapeutic relationships. Any faithful reading of the remaining language in the definition must incorporate the same lexical cues and constraints—much like we incorporated them in our analyses in *Allen* and *Gonzalez.*

At least one court, analyzing the reach of its specialized relationship requirement, has concluded its statute can only be read to cover relationships "closely associated with the traditional profession of therapeutic psychology," and relationships in which professionals employ "therapeutic techniques" in performing or purporting to perform "psychotherapy." *State v. Ambrose,* 540 N.W.2d 208, 212 (Wis. Ct. App. 1995). The court in *Ambrose* considered a case involving a high school teacher who was pursuing a master's degree in psychology. *Id.* at 210. A student had approached him and asked for help with her depression and related family problems. *Id.* He began meeting with her a few times a week, and at these meetings she "told him about her feelings, family problems, depression and thoughts of suicide." *Id.* The relationship lasted several months, was briefly interrupted by summer vacation, and eventually escalated into a sexual relationship. *Id.* at 210–11. The teacher was charged and convicted under Wisconsin's sexual exploitation statute, which prohibits sexual contact between "[a]ny person who is or who holds himself or herself out to be a therapist and who intentionally has sexual contact with a patient or client during any ongoing therapist–patient or therapist–client relationship." *Id.* at 209 n.1; *see also* Wis. Stat. Ann. § 940.22(2).

The *Ambrose* court found several factors persuasive in concluding its statute could not reach the teacher's conduct. First, the court noted

a professionalism requirement in its statutory definition of psychotherapy, which required " 'the use of learning, conditioning methods and emotional reactions' " " 'to assist persons to modify feelings, attitudes, and behaviors.' " *Id.* at 209 n.1, 212 (quoting Wis. Stat. Ann. § 455.01(6)). Second, the court highlighted the statute's enumeration of the relevant categories of actors, which read as follows: " 'physician, psychologist, social worker, marriage and family therapist, professional counselor, nurse, chemical dependency counselor, member of the clergy.' " *Id.* (quoting Wis. Stat. Ann. § 940.22(1)(i)). Those professionals, the court explained, "are closely associated with the traditional profession of therapeutic psychology," indicating the statute's coverage of relationships accomplishing the specialized "purpose of the profession" of psychotherapy. *Id.* at 212. Third, the court noted there was no evidence psychotherapy was typically a "part of the training, education or expertise" for teachers. *Id.* Fourth, the court observed that an individual "who conducts informal counseling, even one with a degree in psychology, is not engaged as a professional therapist." Finally, the court explained, the teacher had never held himself out as a therapist publicly or privately; he, much like most other teachers, was not trained or experienced in the field of psychotherapy; and he was neither employed nor compensated for the performance of psychotherapy services. *Id.* For those reasons, the court concluded, the evidence failed to establish the "counseling" performed by the teacher had reached the level of professional psychotherapy, and the court therefore reversed his convictions. *Id.*

The *Ambrose* court's analysis of Wisconsin's narrowly drawn statute squares convincingly with my understanding of our own narrowly drawn statute. Various cues in section 709.15, including the limited

enumeration of specific classes of professionals, the patient or client requirement, the incorporation of specific terms in the definition of mental health services implicating specialized, formal forms of therapy, and the numerous other statutory cues implicating technical, professional forms of therapy indicate our statute reaches only formal professional therapeutic relationships. If we conclude otherwise—if we, for instance, conclude our statute covers less formal relationships, regardless whether they might be characterized as involving "counseling" or other forms of mental health services, as the majority appears to suggest—we must confront constitutional problems of overbreadth and vagueness, and might, in cases involving clergy members, encounter entanglement and other constitutional issues.[11]  *See, e.g., Allen*, 565

---

[11]After adopting its sweeping interpretation in lieu of the narrower one I favor, however, the majority attempts to sidestep these issues by asserting several times, inaccurately in my view, that Edouard has failed to raise overbreadth and vagueness arguments on appeal. I believe a few observations are warranted here.

In the jury instruction colloquy in the district court, Edouard argued "[t]he scope of mental health services and the scope of the statute is overbroad, in that it covers protected activities" and "the definition and scope of mental health services is unconstitutionally vague." In both his pretrial motion to dismiss and his posttrial motion for arrest of judgment, he argued the Federal Constitution and the Iowa Constitution provide protection against legislative acts that interfere "with certain fundamental rights and liberty interests." On appeal, Edouard advances several specific overbreadth arguments. For example, he argues that under the State's proffered definition of mental health services, "every person would have a mental health dysfunction." Relatedly, he argues "[t]he constitutional flaw in the statute as applied in the State's theory of prosecution is that it presumes an unequal power balance merely from Edouard's status as a member of the clergy." In addition, Edouard cites very prominently in his constitutional analysis *Roe v. Wade*, 410 U.S. 113, 164, 93 S. Ct. 705, 732, 35 L. Ed. 2d 147, 183 (1973). By most accounts, *Roe* was an overbreadth case, as the majority explained the Texas statute at issue "swe[pt] too broadly," and made "no distinction between abortions performed early in pregnancy and those performed later." *Id.* at 164, 93 S. Ct. at 732, 35 L. Ed. 2d at 183; *see also Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1011, 113 S. Ct. 633, 634, 121 L. Ed. 2d 564, 565 (1992) (Scalia, J., dissenting) (explaining the *Roe* court "seemingly employed an 'overbreadth' approach"). These features, among others, of Edouard's appeal are indisputably overbreadth arguments in my view.

Similarly, Edouard's vagueness arguments abound on appeal. "If [the *Gonzalez* definition] does not apply, as the State suggests," Edouard argues, "then what definition

N.W.2d at 337 (explaining statute may be unconstitutional if it reaches "substantial amount of protected conduct" (internal quotation marks

_____

of 'counseling' should apply here?" Relatedly, he cites *Knight v. Iowa District Court*, 269 N.W.2d 430, 433 (Iowa 1978), for the proposition that "criminal acts that are malum prohibitum must be delineated clearly and unequivocally." And, as noted, he cites *Roe*, where the Court clearly explained it would not address a vagueness challenge only because the overbreadth grounds were dispositive. *Roe*, 410 U.S. at 164, 93 S. Ct. at 732, 35 L. Ed. 2d at 183. Given these features of Edouard's appeal and others, I do not believe we can seriously conclude Edouard has failed to advance a vagueness challenge here.

Finally, I would note I do not believe we can appropriately "compartmentalize" Edouard's vagueness and overbreadth challenges for purposes of analysis here, as we have done many times without explanation in the past. *See Smith v. Goguen*, 415 U.S. 566, 577 n.20, 94 S. Ct. 1242, 1249 n.20, 39 L. Ed. 2d 605, 614 n.20 (1974) ("Appellant is correct in asserting that Goguen failed to compartmentalize in his state court brief the due process doctrine of vagueness and First Amendment concepts of overbreadth. . . . But permitting a degree of leakage between those particular adjoining compartments is understandable."). As numerous authorities have recognized, the purpose of the special vagueness variant applicable in First Amendment cases and other cases involving fundamental rights parallels that of both the "ordinary" vagueness doctrine and the "ordinary" overbreadth doctrine: Each is designed "to avoid the chilling of constitutionally protected expression and to reduce the possibility that an open-ended delegation of authority may lead to selective enforcement against unpopular causes." Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 904 (1991) [hereinafter Fallon] (footnotes omitted) (internal quotation marks omitted); *see also Kolender v. Lawson*, 461 U.S. 352, 358 n.8, 103 S. Ct. 1855, 1859 n.8, 75 L. Ed. 2d 903, 910 n.8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines."); *Goguen*, 415 U.S. at 573, 94 S. Ct. at 1247, 39 L. Ed. 2d at 612 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts."); *cf.* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 276 (1993) ("In fact, the Court has been applying overbreadth analysis in substantive due process cases for quite some time, albeit without expressly stating as much."). Thus, it may well be that in a case like this one, Edouard's vagueness challenge is "best conceptualized as a subpart of First Amendment overbreadth doctrine." *See* Fallon, 100 Yale L.J. at 904. Regardless the conceptualization, however, I believe Edouard, in addressing the broad interpretation the majority adopts with specific vagueness and overbreadth arguments, has asserted his "right not to be burdened by an unconstitutional rule of law." Henry Paul Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1, 4 (1981) ("[A]n overbreadth litigant [does not] invoke the rights of third parties; as 'a theoretical matter the [overbreadth] claimant is asserting his own right not to be burdened by an unconstitutional rule of law, though naturally the claim is not one which depends on the privileged character of his own conduct."); *see also* William A. Fletcher, *The Structure of Standing*, 98 Yale L.J. 221, 244 (1988) ("[Someone who makes an overbreadth challenge to a statute] is not directly asserting [an]other person's rights to engage in protected conduct; rather, she is asserting her right to be free from control by an invalid statute."); Marc E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement*, 48 Am. U. L. Rev. 359, 367 (1998) ("Thus, the overbreadth challenger might claim that he or she is asserting a personal right to be free from prosecution because an overbroad law that permits some unconstitutional applications cannot be enforced against anyone.").

omitted)); *State v. Bussman*, 741 N.W.2d 79, 91–92 (Minn. 2007) (concluding sexual exploitation statute was unconstitutional as applied to clergy member, and noting it might reach any relationship in which clergy member and congregant had sexual contact "if the two were also, as would seem likely, discussing spiritual or religious matters on an ongoing basis"); *cf. Carter v. Broadlawns Med. Ctr.*, 857 F.2d 448, 457 (8th Cir. 1988) ("[T]he record established that Chaplain Rogers also provides a significant amount of purely secular counseling to the employees. She testified that her exchanges with staff members primarily involved assisting the employees with personal problems, such as letting off steam about supervisors, dealing with gossip and teen-age children, and venting grief over loss of a family member. Chaplain Rogers viewed her service as giving support and encouragement, and she stated that it was relatively rare for these interactions to assume a religious nature.").

As we have explained on numerous occasions, our doctrine of constitutional avoidance compels us to avoid constitutionally impermissible constructions of statutes where possible. *See, e.g., State v. Dist. Ct.*, 843 N.W.2d 76, 85 (Iowa 2014). My understanding of section 709.15 and its coverage of formal professional therapeutic relationships avoids implication of the issues recognized in *Allen* and *Bussman*, and is consistent with our general preference for steering clear of constitutionally problematic constructions. *See, e.g.,* Toben & Helge, 1 Brit. J. Am. Legal Stud. at 215 ("Numerous state legislatures such as [those in] Kansas and Texas have recently proposed or passed bills into law to attenuate this sexual misconduct problem, however, most of these bills passed into law include language that requires a court to interpret church policy or doctrine. Consequently, these laws have either

encountered or potentially could meet constitutional entanglement issues."); *see also* Robert J. Basil, Note, *Clergy Malpractice: Taking Spiritual Counseling Conflicts Beyond Intentional Tort Analysis*, 19 Rutgers L.J. 419, 444–45 n.96 (1988) ("Analogy to medical malpractice is appropriate . . . when the standard addresses a procedural duty which is based on a duty of professionalism, rather than religious beliefs.").

I would therefore take this occasion to reiterate our longstanding recognition that section 709.15 has been narrowly drawn to reach only formal therapeutic relationships. *See Gonzalez*, 718 N.W.2d at 308 (concluding establishment of "therapeutic relationship[]" with psychiatric patient could constitute treatment for purposes of section 709.15); *Allen*, 565 N.W.2d at 337 (explaining statute does not reach relationships "involving the informal exchange of advice[]"). Further, I would emphasize the statute has set forth several specific requirements to ensure an interaction rises to the level of covered formal professional relationship including, but not limited to: the actor must fit comfortably within the classes of professionals enumerated in the definition of "counselor or therapist"; the emotional dependence must arise from a specific kind of emotional condition or from a specific course of treatment provided by the counselor or therapist; the alleged victim must be or have been a "patient or client" of the counselor or therapist; and the treatment provided by the actor must be consistent with and rise to the level of the specific diagnostic and therapeutic services contemplated by the terms incorporated in the statutory definition of "mental health services." *See* Iowa Code § 709.15; *see also Gonzalez*, 718 N.W.2d at 308. Edouard's entire defense was based on the propositions that (1) he and the State's complaining witnesses did not have a formal treatment relationship of the type covered by the statute, and (2) he did not provide,

or purport to provide, mental health services to clients or patients. With these principles, requirements, and contentions in mind, I turn to Edouard's challenges regarding the marshaling instructions and the district court's ruling on the proffered expert testimony.

**A.    Marshaling Instructions.**    Under Iowa law, the trial court must provide the jury with instructions setting forth the law applicable to all material issues in a case. *State v. Marin*, 788 N.W.2d 833, 837 (Iowa 2010). In addition, the court must give a requested instruction when it states a correct rule of law applicable to the facts of the case and the concept is not otherwise conveyed in other instructions. *Id.* We have not required the trial court give any particular form of instruction; instead, we have explained the court must give instructions fairly stating the law as it applies to the facts of the case before it. *Id.* at 838.

Here, the district court instructed the jury as follows:

The State must prove each of the following elements of Sexual Exploitation by a Counselor or Therapist as to [alleged victim]:

1.  On or about January, 2006, through 2008, the defendant engaged in sexual conduct with [alleged victim].

2.  The defendant did so with the specific intent to arouse or satisfy the sexual desires of either the defendant or [alleged victim].

3.  The defendant was then a counselor or therapist.

4.  [Alleged victim] was then receiving mental health services from the defendant, or had received mental health services from the defendant within one year prior to the conduct.

The court added an instruction defining "counselor or therapist" as including "a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide

mental health services." The court also provided the following definition for "mental health services":

> the providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intrapersonal or interpersonal dysfunction. It does not include strictly personal relationships involving the informal exchange of advice, nor does it include the giving of general spiritual advice or guidance from a clergy member to congregants. It contemplates a counseling relationship with the clergy member established for the purpose of addressing particular mental, intrapersonal or interpersonal dysfunctions.

Edouard objected to these instructions on the grounds they failed to convey the patient or client requirement set forth in the statute, failed to convey the scientific definitions of the specific terms incorporated in the statutory definition of "mental health services" we relied on in *Gonzalez,* and failed to convey the statute's enumeration of specific professional classes of actors in defining "counselor or therapist." He proposed a modified set of instructions incorporating each of these elements, but the court declined to adopt them. On appeal, Edouard reiterates his contentions and argues the district court abused its discretion in declining to give his proposed instructions.

Based on my review of the explicit statutory requirements and the principles articulated in our caselaw, I conclude Edouard's contentions have merit. The "patient or client" requirement, for example, was very plainly applicable to Edouard's defense and his proposed instruction accurately stated the relevant law. The requirement is set forth both in the statute itself and in the relevant pattern criminal jury instructions. *See* Iowa Code § 709.15(1)(*e*); Iowa State Bar Ass'n, *Iowa Crim. Jury Instruction* 920.3 (2013). While the district court's instructions incorporated a requirement that the alleged victims had received mental health services from Edouard, consistent with the statutory definition of

patient or client, they failed to include the important statutory "patient or client" language itself. As I have explained above, this language is crucial to understanding section 709.15, as it explicitly emphasizes the formal professional therapeutic relationship contemplated by the statute. It was the State's burden to prove more than the fact that Edouard met and spoke with the four women about intensely personal matters. The meetings and conversation must have been in the context of a formal professional therapeutic relationship in which the women became Edouard's patients or clients—not merely members of his congregation. Lacking specific language capturing the basic statutory requirement of a formal therapeutic relationship, I believe the jury instructions as given allowed for an unduly broad understanding of the statute, risking the possibility the jury might have concluded the statute reached conduct even in the absence of the required specialized relationship. *See, e.g., Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 452–54, 109 S. Ct. 2558, 2566–67, 105 L. Ed. 2d 377, 390–92 (1989) (explaining reliance on statutory definition was "not entirely satisfactory" and looking for "other evidence of congressional intent to lend the term its proper scope"); Darryl K. Brown, *Regulating Decision Effects of Legally Sufficient Jury Instructions*, 73 S. Cal. L. Rev. 1105, 1113 (2000) (noting two or more "formally equivalent" descriptions of statutory element often lead "decisionmakers to different choices" because "one presentation triggers inferences and assumptions that change its effective meaning"); Peter Tiersma, *The Rocky Road to Legal Reform: Improving the Language of Jury Instructions*, 66 Brook. L. Rev. 1081, 1102–03 (2001) (noting model instruction committee will often recommend use of both statutory term and more ordinary meaning because jurors may be as familiar with statutory term and because ordinary meaning may not be "close enough

in meaning"); *cf. United States v. Kozminski*, 487 U.S. 931, 969–70, 108 S. Ct. 2751, 2774, 101 L. Ed. 2d 788, 822 (1988) (Stevens, J., concurring) ("In my view, individuals attempting to conform their conduct to the rule of law, prosecutors, and jurors are just as capable of understanding and applying the term 'involuntary servitude' as they are of applying the concept of 'slavelike condition.' Moreover, to the extent 'slavelike condition of servitude' means something less than 'involuntary servitude,' I see no basis for reading the statute more narrowly than written.").

Similarly, Edouard's request for an enumeration of the specific categories of mental health professions in the statutory definition of "counselor or therapist" duplicated the applicable statutory language, and would have provided important context for understanding the types of relationships covered by section 709.15. The statutory definition does not merely implicate clergy and any other person who might purport to provide mental health services, as the definitions offered by the district court and majority suggest. Instead, the definition sets forth an illuminating list of specific categories of professionals who provide mental health services, while excluding other classes of actors who might also engage in relationships with emotional or related underpinnings. This definition, as I have explained, is crucial context for an appropriate understanding of section 709.15. Section 709.15 covers not just any relationship involving an enumerated professional and having some mental health component, but only those relationships in which the provider and an emotionally dependent client or patient (or former client or patient) have engaged in a formal therapeutic mental health relationship. The statute's itemization of the professionals who commonly provide mental health services emphasizes the importance of

the existence of a formal therapeutic relationship as a key feature of the state's burden of proof and Edouard's defense. In my view, the district court's omission from the instructions of Eduoard's request for the statutory itemization of professionals providing such professional services left the jury with an unduly broad understanding of the statute's circumscribed reach. *See, e.g.*, *Sorg,* 269 N.W.2d at 132 ("Under the applicable rule of Noscitur a sociis, the meaning of a word in a statute is ascertained in light of the meaning of words with which it is associated."); *State v. Roggenkamp*, 106 P.3d 196, 200 (Wash. 2005) (explaining "shelter" in the phrase "food, water, shelter, clothing, and medically necessary health care . . . should not be isolated and analyzed apart from the words surrounding it"); *see also United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir. 1991) (requiring instructions to "state the law which governs" and provide "the jury with an ample understanding of the issues and standards applicable" (internal quotation marks omitted)); Robert W. Rieber & William A. Stewart, *The Interactions of the Language Sciences and the Law*, 606 Annals N.Y. Acad. Sci. 1, 2 (1990) ("In more than one instance, linguistics and the law have independently discovered the same principles of language. For example, the legal canon of construction noscitur a sociis (indicating that the meaning of words is to be known from the other words with which they are associated) is, in essence, the semanticist's principle of contextual constraints on lexical meaning.").

Finally, Edouard's request for specific definitions of "counseling," "treatment," and "assessment" duplicated the definitions we set forth in *Gonzalez*, and was clearly applicable to his defense. The definitions would have provided additional important context for the jury, conveying the technical nature of these terms and their close association with

professional diagnosis and treatment of emotional and cognitive dysfunctions affecting clients or patients. While the *Gonzalez* definitions need not constitute exhaustive definitions for purposes of section 709.15 analysis, they do accurately convey the general statutory meaning, and they do clearly bound the universe of acceptable interpretations of mental health services in implicating only specific classes of formal therapeutic relationships. *See Gonzalez*, 718 N.W.2d at 308–09 (emphasizing therapeutic relationship, therapeutic environment, and formal psychiatric environment). The omission of these definitions or any related indication of the technical meaning of mental health services in the jury instructions given by the district court again raises the risk of an unduly broad understanding of the statute.

Because the jury instructions failed to convey these important legal limiting principles, I would conclude the district court erred in refusing to submit Edouard's proposed instructions. *See Marin*, 788 N.W.2d at 837. Instructional errors of this kind, we have previously explained, warrant reversal unless the record demonstrates an absence of prejudice. *State v. Frei*, 831 N.W.2d 70, 73 (Iowa 2013). For errors of nonconstitutional magnitude, we have noted prejudice is established when it appears the rights of the complaining party have been injuriously affected, or it appears the party has suffered a miscarriage of justice. *Id.* The omission of the requested instructions here failed to ensure the jury would apply each of the distinct statutory elements substantiating a formal professional therapeutic relationship in evaluating Edouard's defense he had never engaged in a relationship of the kind contemplated by the statute. A failure of that nature, we have often said, will establish prejudice. *See, e.g., State v. Kellogg*, 542 N.W.2d 514, 518 (Iowa 1996) (reversing conviction of domestic abuse assault where jury instruction

failed to explicitly enumerate all relevant indicia of cohabitation). Analyzing the instructional error here in conjunction with the evidentiary error I discuss next, I conclude the record conclusively establishes prejudice.

**B. Expert Testimony.** Turning to the first of Edouard's evidentiary challenges, I note the district court limited Dr. Wakefield's proposed expert testimony regarding the differences between pastoral care and pastoral counseling, on the ground it would be unhelpful to the jury and would usurp the "function of the jury." At the outset, I note we have often emphasized our commitment to a liberal view on the admissibility of expert testimony. *Leaf v. Goodyear Tire & Rubber Co.*, 590 N.W.2d 525, 531 (Iowa 1999). For purposes of determining the admissibility of expert evidence, we have recently explained, it is of no moment that testimony addresses " 'an ultimate issue to be decided by the trier of fact.' " *See In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005) (quoting Iowa R. Evid. 5.704). Instead, we noted, our evidence rules compel us to consider whether the evidence meets our other longstanding evidentiary requirements. *Id.* The problem with a specific subset of expert testimony offered in a form embracing a legal conclusion, we emphasized, is "not that the opinion" may usurp the function "of the jury," but rather that it may conflict with the responsibility of the court to determine applicable law and to instruct the jury accordingly. *Id.* To determine whether that conflict exists, we explained, we must look to standard evidentiary inquiries: the question of whether the evidence is helpful to the fact finder, the likelihood of misunderstanding by the fact finder of the legal terms used, and the question of whether the factual basis for any legal terms used has been adequately developed. *Id.* at 419–20.

Focusing attention on the appropriate inquiries, I note we have often looked for guidance to the approaches other jurisdictions have taken in analyzing their own closely related rules of evidence. *See id.* (noting Iowa Rule of Evidence 5.704 is "identical to its federal counterpart," and analyzing federal caselaw and standard evidence treatises). Several authorities have set forth principles applicable to our helpfulness analysis here. Courts have explained, for example, that expert testimony is generally helpful where it relates to subject matter outside the common experience of the jury. *See, e.g., Fed. Crop Ins. Corp. v. Hester*, 765 F.2d 723, 728 (8th Cir. 1985) (noting admissibility of expert testimony regarding farm production on this basis); *United States v. Johnson*, 735 F.2d 1200, 1202 (9th Cir. 1984) ("The federal courts uniformly hold . . . that government agents or similar persons may testify as to the general practices of criminals to establish the defendant's modus operandi. Such evidence helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior."). Expert testimony regarding business practices and customs unfamiliar to the general public has therefore often been deemed admissible. *See, e.g., United States v. McIver*, 470 F.3d 550, 560–62 (4th Cir. 2006) (concluding expert testimony that physician treated patients outside course of legitimate medical practice was admissible); *United States v. Perkins*, 470 F.3d 150, 159–60 (4th Cir. 2006) (permitting testimony regarding reasonableness of use of force, explaining touchstone was whether testimony was helpful to jury, and noting questioning focused on witness's "personal" assessment of defendant's use of force); *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218–19 (3d Cir. 2006) (explaining testimony regarding securities industry practice and custom was

admissible and probative of buyer's state of mind at time of agreement); *United States v. Mohr*, 318 F.3d 613, 624–25 (4th Cir. 2003) (explaining expert testimony that use of police dog "violated 'prevailing police practices'" did not impermissibly tell jury "'what decision to reach'"); *TCBY Sys., Inc. v. RSP Co.*, 33 F.3d 925, 929 (8th Cir. 1994) (permitting testimony in action for breach of franchise agreement that franchisor's site-review-and-evaluation process failed to meet minimum custom and practice observed by franchisors in fast food franchise industry); *State v. LaCount*, 750 N.W.2d 780, 787–88 (Wis. 2008) (permitting testimony regarding the basic factual characteristics of an investment contract to assist the jury in determining whether a transaction involved a security).

In my view, Dr. Wakefield's testimony was of a type that would have been helpful to the jury on multiple levels. First, as Edouard was a pastor rather than a psychiatrist, psychologist, or social worker, Dr. Wakefield would have provided important context for the jury. Unlike the other typical providers of mental health services, pastors spend much of their time providing pastoral care that falls outside the statutory definition of mental health services. Edouard's defense turned on the jury understanding that pastors interact with their parishioners in countless ways that—although often very supportive and beneficial—do not constitute "mental health services" as contemplated in section 709.15. The district court's ruling denied the jury this helpful information that was essential to Edouard's theory of defense, and outside the jury's common understanding.

Even where proposed testimony falls generally within the common understanding of the jury, authorities have typically agreed testimony may be helpful when it offers specialized knowledge. *See, e.g., Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("The subject matter of Rule

702 testimony need not be arcane or even especially difficult to comprehend. If, again in the disjunctive, the proposed testimony will recount or employ 'scientific, technical, or other specialized knowledge,' it is a proper subject."); 7 Wigmore on Evidence § 1923, at 31–32 (Chadbourn rev. 1978) ("The true test of the admissibility of such testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter, but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the Court or jury in determining the questions at issue."). Likewise, where the fact finder may have some knowledge of particular subject matter, but the knowledge may be incomplete or inaccurate, courts have recognized expert testimony may be helpful. *See, e.g.*, *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994) ("Despite the prevalence of organized crime stories in the news and popular media, [crime family structure and terminology] remain proper subjects for expert testimony."). In this case, Dr. Wakefield's knowledge of the important distinction between pastoral care and mental health counseling provided by pastors was specialized information that would have been helpful to the jury in sorting out whether Edouard engaged, or purported to engage, in counseling as the term is defined in section 709.15. Although jurors might be expected to have some general knowledge about tasks commonly performed by pastors, their knowledge of the distinction between pastoral care and pastoral counseling that could have been illuminated by Dr. Wakefield was likely incomplete or inaccurate. Dr. Wakefield's testimony could have minimized the risk jurors harbored a misunderstanding that counseling by pastors within the circumscribed meaning of section

709.15 extends beyond professional therapeutic relationships with emotionally dependent patients or clients receiving mental health services. Just as the evidence would have assisted the jury, it would have been very helpful to the defense in this case.

The majority perfunctorily rejects Edouard's proffer of Dr. Wakefield's testimony as an effort to redefine mental health services in a manner incompatible with the meaning of section 709.15 and opine that Edouard didn't provide them. I strongly disagree with this characterization. The effort was instead calculated to communicate specialized knowledge about mental health services provided by pastors in formal therapeutic relationships with clients or patients. The effort was to educate the jury that the same definition of counseling and mental health services applicable to a psychiatrist, psychologist, or social worker in a prosecution under section 709.15 should be applied against Edouard as a pastor. In other words, the defense sought through Dr. Wakefield's testimony to guard against the distinct possibility that the jury might misunderstand that "counseling" has a much broader meaning in the pastoral context than in other professional contexts. Accordingly, I believe the majority misses the mark when it asserts Edouard's offer of expert testimony was calculated to redefine the statutory standard. The offer was absolutely consistent with the statutory framework's central limiting principles, and should have been received.

Further, where no other evidence is available on an issue, courts have explained expert testimony may be crucial to the fact finder's understanding. *See, e.g., Harris v. Pac. Floor Mach. Mfg. Co.,* 856 F.2d 64, 67–68 (8th Cir. 1988) (noting distinction between testimony regarding criteria by which expert would form an opinion about the adequacy of a

warning, which was important to fact finder's understanding, and direct testimony regarding adequacy of warnings, which failed to provide similar aid). No other trial witness supplied the specialized knowledge offered by Dr. Wakefield.

Perhaps most importantly, courts have recognized the importance of the issue to which expert testimony relates is a significant factor in assessing the testimony's helpfulness. *See, e.g., United States v. Alexander*, 816 F.2d 164, 167–69 (5th Cir. 1987) (explaining district court erred in excluding evidence bearing directly on issue central to determination of defendant's guilt). In my view, the majority completely misapprehends the crucial significance of this evidence to the defense. There was no more important witness for Edouard in this case than Dr. Wakefield, who offered specialized knowledge illuminating what mental health counseling looks like when it is provided by a pastor to parishioners who are his clients or patients.

Courts have also articulated useful principles for analyzing the likelihood of jury confusion and the question of whether adequate factual basis for any testimony has been developed. As we explained in *Palmer,* we are most frequently concerned with opinions implicating legal standards and terminology when the fact finder may not understand the legal definitions of the terms and standards used. *Palmer*, 691 N.W.2d at 419. Various courts have elaborated on this concern, noting where testimony fails to explain how tests and terms with legal meaning relate to the facts in the case, the fact finder may not understand the testimony or may attribute a meaning unintended by the witness. *See, e.g., United States v. Simpson*, 7 F.3d 186, 188–89 (10th Cir. 1993) ("When an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based, the jury is

provided with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony."). Thus, courts have explained, experts may often avoid the problem of confusion by employing language that does not have unrelated meaning under the law applicable to the case. *See, e.g.*, *United States v. Duncan*, 42 F.3d 97, 103 (2d Cir. 1994) (permitting testimony about defendant's submission of false tax returns, where witness did not rely specifically on terms derived directly from statutory language but, instead, used terms laypersons could understand). Dr. Wakefield's testimony was, as I have suggested above, clearly calculated to eliminate jurors' confusion surrounding the nature and extent of mental health services provided by pastors.

Similarly, experts have avoided problems of confusion by using language with a meaning accessible to laypeople, by using language having the same lay meaning as the legal meaning, or by clearly signifying the use of a specific meaning when the lay and legal meanings differ. *See, e.g.*, *United States v. Nixon*, 918 F.2d 895, 905 (11th Cir. 1990) ("Considered in context, the police detective's use of the term 'conspiracy' was a factual—not a legal—conclusion and did not track unduly the definition of the offense in [the relevant statute]."); *United States v. Kelly*, 679 F.2d 135, 136 (8th Cir. 1982) (permitting narcotics officer's testimony that quantity of cocaine found on defendant at time of arrest was "a quantity that would be possessed with intent to distribute"); Maury R. Olicker, Comment, *The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?*, 42 U. Miami L. Rev. 831, 872 (1988) ("There is yet another group of cases [admitting opinion testimony] in which the court found that, although the witness reached a conclusion using a term of law, his statement must properly be understood in another context, completely disregarding the legal

meaning. This is not quite the same as saying that the jury will not be confused because it will automatically tend to attach the correct meaning to the term. Instead, the court is saying that because of the broader context of the witness's testimony, the jury will understand that he did not mean the word in a legal sense but in some other sense."). Dr. Wakefield's testimony on the important distinction between pastoral care and pastoral counseling would not, in my view, have increased the risk of jury confusion. On the contrary, her explication of the context in which pastors—like other mental health professionals—provide mental health services to emotionally dependent patients or clients in a formal therapeutic environment was expressed in words entirely consistent with the carefully circumscribed meaning of the essential terms within section 709.15.

Finally, various courts have explained the distinction between admissible factual opinion and impermissible legal conclusion may often be difficult to perceive based on the overlap of the terms used. In these cases, cognizant of the potential for confusion, courts have nevertheless often allowed the proposed testimony, explaining "[m]edical and legal terms often overlap, and a medical expert cannot be expected to use different words merely to avoid this specific problem." *See, e.g.*, *United States v. Two Eagle*, 318 F.3d 785, 793 (8th Cir. 2003); *Hagen Ins. Inc. v. Roller*, 139 P.3d 1216, 1222–23 (Alaska 2006). Fairness and efficiency concerns will often dictate admissibility, courts have explained, as long as the testimony is confined to relevant issues, is based on proper legal concepts, and meets the other requirements of the rules of evidence. *See, e.g.*, *First Nat'l State Bank of N.J. v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (permitting testimony regarding trade usage of terms having legal meaning, to inform jury of bank customs and to assist it in

determining whether plaintiff bank was entitled to claim benefits of holder in due course); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987).

In summary, I conclude Dr. Wakefield's proposed testimony about the differences between pastoral care and pastoral counseling addressed subject matter not commonly known to the jury, contained specialized knowledge of the range and types of tasks typically performed in each pastoral role, and constituted the only means by which the jury could have gathered this information of central importance to the defense. Those factors, the courts have explained, are indicative of helpfulness, and weigh heavily in favor of admissibility. *See, e.g.*, *Kopf*, 993 F.2d at 377; 7 Wigmore on Evidence § 1923, at 31–32. Moreover, Dr. Wakefield's testimony was central to Edouard's defense. Her testimony was offered to explain the types of tasks Edouard might typically be expected to perform in his role as a pastoral caregiver, distinguishing those tasks from the types of tasks he might be expected to perform in a role as pastoral counselor. In furtherance of this distinction, Dr. Wakefield's proposed testimony would have supported an inference that the tasks in the latter role would closely track the types of services provided by other mental health services professionals under section 709.15. This factual background was directly relevant to the jury's evaluation of Edouard's defense that, although his conduct could be viewed as pastoral care, he did not provide mental health services as contemplated by the statute. Exclusion of crucial background information of this kind, courts have explained, may often constitute reversible error. *See, e.g.*, *Alexander*, 816 F.2d at 169 ("The entire case against Victor Alexander turned on the photographic identification, and it was clearly erroneous for the district court to exclude without good reason relevant expert testimony bearing

directly on that issue."); *State v. Eichman*, 456 N.W.2d 143, 150 (Wis. 1990) (concluding sexual exploitation case was "particularly appropriate for the admission of expert testimony" explaining certain specific practices of psychotherapy and the defendant's typical responsibilities, on the ground the factual background regarding these practices and responsibilities would not typically be "within the understanding of the ordinary person").

Furthermore, I note the distinction between pastoral care and pastoral counseling detailed in Dr. Wakefield's proposed testimony presented minimal risk the jury would inappropriately confuse the terms and standards she proposed to use with those provided in section 709.15. The statute makes no reference, in any provision, to pastoral care or pastoral counseling. In addition, her use of the word "pastoral" to modify the word counseling helped to alleviate concern the jury might be unable to distinguish her use of "pastoral counseling" from the statute's use of the word "counseling." Her description of the role of the pastoral counselor also worked to minimize the risk of inappropriate confusion, given her exposition of the tasks and techniques involved, and the fact that these tasks and techniques largely coincided with those associated with the technical meaning of counseling incorporated in the statute. *See Palmer*, 691 N.W.2d at 421 ("[T]here was an abundance of testimony by Dr. Salter concerning the meaning of the term 'likely.' Under these circumstances, Dr. Salter's use of the statutorily defined term 'likely' did not render her opinion inadmissible."); *id.* (explaining danger of jury confusion may arise when expert and jury are not " 'on the same page' " with respect to differing statutory and testimonial meaning).

Given the demonstrable helpfulness of Dr. Wakefield's proposed testimony, its central importance to Edouard's defense, the minimal

likelihood the jury might confuse the meanings of the terms used with unrelated lay meanings, and the extensive factual basis for the use of those terms overlapping with the statutory terms, I conclude the district court erred in excluding the testimony. As is the case with instructional error, I would presume the evidentiary error was prejudicial and requires reversal unless the record affirmatively establishes lack of prejudice. *See, e.g., State v. Paredes*, 775 N.W.2d 554, 571 (Iowa 2009). For evidentiary errors of constitutional magnitude, we may only find the absence of prejudice if we are convinced the "error alleged was harmless beyond a reasonable doubt." *See, e.g., State v. Simmons*, 714 N.W.2d 264, 278 (Iowa 2006).

Regardless whether the error here rises to the level of constitutional magnitude, I cannot conclude the record affirmatively establishes the absence of prejudice. The evidence would have provided helpful factual information for the jury directly related to Edouard's defense that he was not engaged in the kinds of formal therapeutic relationships contemplated by the statute, and the evidence was unavailable from any other source. The instructional error compounded the impact of the exclusion, as the jury was left without both important factual nuance for distinguishing certain specific classes of relationships from others and important legal nuance for application of the relevant statutory principles to the types of relationships considered. In effect, the jury here was deprived of both factual principles and legal principles acutely relevant to the defense. Those deprivations, I conclude, conclusively establish prejudice and warrant reversal.[12]

---

[12]Because I conclude my resolution of the instructional and evidentiary challenges is dispositive of the outcome here, I will not address Edouard's remaining challenges on appeal.

I join that part of Justice Appel's special concurrence setting forth the analytical approach we take in addressing an issue under the Iowa Constitution where a party also raises the issue under the corollary provision of the Federal Constitution, but does not suggest application of a different standard, or suggest a different application, under the Iowa Constitution.

Wiggins, J., joins this concurrence in part and dissent in part.